# 24-2392-CV

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



GO NEW YORK TOURS INC,

*Plaintiff-Appellant,*

*v.*

GRAY LINE NEW YORK TOURS, INC., TWIN AMERICA LLC, SIGHTSEEING PASS LLC, BIG BUS TOURS GROUP LIMITED, OPEN TOP SIGHTSEEING USA, INC., TAXI TOURS, INC., LEISURE PASS GROUP HOLDINGS LIMITED, LEISURE PASS GROUP LIMITED, LEISURE PASS GROUP INC., BIG BUS TOURS LIMITED,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

Maurice Newmark Ross
BARTON LLP
*Attorneys for Plaintiff-Appellant*
711 3rd Avenue, 14th Floor
New York, New York 10017
212-687-6262



## <u>DISLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellant Go New York Tours, Inc. ("Appellant," or "Go New York"), by and through its undersigned counsel, states that it is a privately held company with no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: New York, New York
       November 11, 2024

**BARTON LLP**

***By:*** *  /s/ Maurice N. Ross /s/  *
      Maurice N. Ross
      Barak F. Bacharach

711 Third Avenue, 14th Floor
New York, NY 10017
(212) 687-6262
mross@bartonesq.com
bbacharach@bartonesq.com
*Attorneys for Appellant*
*Go New York Tours, Inc.*

i

**Table of Contents**

PRELIMINARY STATEMENT ...................................................................1

JURISDICTIONAL STATEMENT .............................................................3

ISSUES PRESENTED FOR REVIEW .......................................................3

STATEMENT OF THE CASE ....................................................................4

   I.   The Previous Antitrust Case .............................................................5

   II.   The Instant Action ...........................................................................7

      A.   The Motion to Dismiss ..............................................................8

      B.   The Order Appealed From ........................................................14

SUMMARY OF THE ARGUMENT ..........................................................15

ARGUMENT .............................................................................................19

   I.   *Twombly* Does Not Permit A Court to Impose a Probability Requirement at the Pleading Stage ...................................................................19

   II.   Go New York Plausibly Alleged Respondents Merged Their Operation .....21

   III.   The District Court Wrongly Resolved Competing Inferences in *Respondents' Favor* ......................................................................26

   IV.   Go New York Stated a Claim for Monopolization and Attempted Monopolization ...........................................................................29

   V.   Go New York Has Adequately Alleged a Conspiracy to Monopolize Under §2 of the Sherman Act ...............................................................32

   VI.   Go New York Plausibly Alleged a Conspiracy In Restraint of Trade .......32

      A.   Go New York Has Plausibly Alleged an Actual Agreement in Restraint of Trade ...............................................................................33

      B.   Go New York has Plausibly Alleged Plus Factors to Infer a Restraint of Trade ...............................................................................34

CONCLUSION ..........................................................................................36

CERTIFICATE OF COMPLIANCE ..........................................................37

**Cases**

*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183  (2010)...........................35

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162  (2d Cir. 2012). 21, 29, 31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................23

*Barnes v. City of New York*, 68 F.4th 123 (2d Cir. 2023)......................................31

*Bell Atlantic v. Twombly,* 550 U.S. 544 (2007) ......................................................21

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979)...............34

*Davis v. Metro N. Commuter R.R.*, No. 23-1041-CV, 2024 WL 1434284 .. 2, 21, 30

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013) ......22

*Fort Wayne Telsat v. Ent. & Sports Programming Network*, 753 F. Supp. 109

(S.D.N.Y. 1990) ............................................................................. 35, 36

*Gelboim v. Bank of Am. Corp.,* 823 F.3d 759 (2d Cir. 2016)....................... 2, 28, 29

*Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229 (2d Cir. 2007)................ 3, 16

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,* 709 F.3d 129 (2d Cir.

2013) ............................................................................................. 8, 37, 39

*Muto v. CBS Corp.*, 668 F.3d 53 (2d Cir. 2012)....................................................20

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015)............ 1, 22

*SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110 (9th Cir. 2022) ..........................22

*Starr v. Sony BMG Music Ent.*, 592 F.3d 314 (2d Cir. 2010) .......................... 19, 31

*TechReserves Inc.* 2014 WL 1325914, at *9 (*quoting Volvo N. Am. Corp.* 857 F.2d at 74) .................................................................................35

*TechReserves Inc. v. Delta Controls Inc.*, No. 13 CIV. 752 GBD, 2014 WL 1325914 .................................................................................32

*Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90 (2d Cir. 1998) ..............32

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55  (2d Cir. 1988) .................................................................................32

*Williams v. Richardson*, 425 F. Supp. 3d 190  (S.D.N.Y. 2019)........................ 3, 16

**Statutes**

15 U.S.C. §1 .................................................................................3, 8

15 U.S.C. §15 .................................................................................3, 8

15 U.S.C. §2 .................................................................................3, 8

28 U.S.C. §1291 .................................................................................3

28 U.S.C. §1331 .................................................................................3

**Rules**

Fed. R. P. 12(b)(6) .................................................................................3

## PRELIMINARY STATEMENT

This case is part of a pattern which has been noted several times by this Court, as well as sister circuits around the United States, of misinterpreting the Supreme Court's holding in *Bell Atlantic v. Twombly,* 550 U.S. 544 (2007) by making improper determinations on disputed issues of material facts at the pleading stage. *See, e.g, SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 434 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) (reversing a dismissal of a Sherman Act claim because "the district court…erred by applying a summary-judgment standard to SawStop's group boycott claim and by confusing 'plausibility' with 'probability.'"). *Twombly* is sound policy insofar it permits courts to discard obviously frivolous litigation at the outset. However, this Court has noted several times that the plausibility standard espoused by *Twombly* is a lower pleading standard than *probability*, and therefore, courts are not permitted to resolve disputed issues of material fact at the pleading stage. That is precisely what occurred in this case.

Go New York alleged that, based on the facts on the ground in the market, Respondents merged their operations into a single operating entity. A. 297-300.[1] However, the District Court accepted Respondents' assertion that a memorandum

---

[1] Citations to the appendix in this brief are in the "A. []" format.

1

of understanding between them was a mere ticket selling arrangement and, therefore, there was no merger. In so doing, the District Court unreasonably disregarded other well-pleaded allegations supporting the existence of agreements among Respondents to merge into a single operating entity. In view of these allegations, supported by concrete on-the-ground evidence, it was, to say the least, implausible for Respondents to deny that they merged their operations. The District Court impermissibly resolved disputed issues of material fact on a motion to dismiss prior to allowing discovery concerning Appellant's well-pleaded allegations. *See Gelboim v. Bank of Am. Corp.,* 823 F.3d 759, 776 (2d Cir. 2016). This was reversible error. *Id.*

This Court repeatedly has been clear that under *Twombly*: "At the pleading stage, the court must accept the allegations in the complaint as true, unless they are conclusory and contradicted by extrinsic material incorporated into the complaint." *Davis v. Metro N. Commuter R.R.*, No. 23-1041-CV, 2024 WL 1434284, at *2 (2d Cir. Apr. 3, 2024) (reversing J. Ramos on the grounds that "the district court erred by engaging in impermissible factfinding"). Further, the Court "must draw all reasonable inferences in the plaintiff's favor." *Williams v. Richardson*, 425 F. Supp. 3d 190, 200 (S.D.N.Y. 2019) (*citing Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007))." In the case at hand, the District Court improperly drew inferences *against* the non-moving party, rather than for it.

2

Failing to reverse the District Court would set a dangerous precedent by allowing trial courts to simply ignore well-pled allegations and improperly resolve disputed issues of material fact at the pleading stage.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because Go New York stated federal claims under the Sherman Act and Clayton Act, specifically 15 U.S.C. §§1, 2, and 15. The district court entered the Order appealed from on August 27, 2024. Appellant filed a notice of Appeal on September 9, 2024. This Court has appellate jurisdiction pursuant to 28 U.S.C. §1291 because this appeal is from a final judgment dismissing the case.

## ISSUES PRESENTED FOR REVIEW

Did the district court err by granting a motion to dismiss without providing all reasonable inferences to the non-moving party and by impermissibly making findings of material disputed issues of fact at the pleading stage?

Answer: Yes. On a motion to dismiss under Fed. R. P. 12(b)(6) a district court must accept as true all well-pleaded facts and resolve competing inferences in the plaintiff's favor. Thus, when well-pleaded facts as alleged by the plaintiff are

in dispute on a motion to dismiss, a district court may not resolve them against the non-moving party.

## STATEMENT OF THE CASE

This case was precipitated by an anticompetitive, monopolistic merger between, at the time, the first and second largest hop-on, hop-off sightseeing bus companies in New York City, Respondents Twin America, LLC ("Twin America"), Gray Line New York Tours, Inc., and Sightseeing Pass LLC ("Sightseeing Pass" and collectively with Gray Line New York Tours, Inc. and Twin America, "Gray Line") and Respondents Open Top Sightseeing USA, Inc., Taxi Tours, Inc., and Leisure Pass Group, Inc.[2] (collectively known as "Big Bus" and collectively with Gray Line, "Respondents"), respectively. However, Respondents' anticompetitive behavior goes back much further than the merger, as the merger was merely an intensification and continuation of a previous conspiracy to restrain trade in the New York City hop-on, hop-off sightseeing tour bus market. A. 15. As alleged by Go New York, Respondents had effectuated that conspiracy by using their combined market power to coerce certain non-parties into not doing business with Go New York. However, in or about the summer of 2020, when the hop-on, hop-off tour bus industry was shut down because of the COVID-19

---

[2] Leisure Pass Group, Inc., recently changed its name to Go City, Inc.

pandemic, Respondents took advantage of the situation to merge their operations for the purpose of creating a monopoly in the New York City hop-on, hop-off tour bus market. A. 15. Thus, on or about May 22, 2023, Go New York brought suit seeking damages, and to enjoin Respondents' monopolistic and otherwise anti-competitive behavior.

## I.    The Previous Antitrust Case

As previously alluded to, however, this is not the first case between the parties involving anticompetitive behavior. Go New York first asserted antitrust claims against Respondents in March 2019, in a previous action, *Go New York Tours, Inc. v. Gray Line New York Tours, Inc., et al.,* S.D.N.Y. Case No. 19-cv-02832. A. 50. On May 23, 2019, Go New York filed a first amended complaint in that action asserting claims under the Sherman Act, §§1-2, and its state law corollary, the Donnelly Act, based almost exclusively on Big Bus and Gray Line's attempts to dominate the Attraction Pass sub-market of the New York City hop-on, hop-off market by shutting Go New York out of arrangements with non-party attractions. A. 56-82. Big Bus, Gray Line, and Go New York all sell their hop-on, hop-off services largely through "attraction passes," wherein a hop-on, hop-off bus operator bundles admission to its buses with admission to other attractions around the city. A. 66-67. In order to offer a competitive "attraction pass" a tour bus operator must partner with attractions to buy wholesale lots of tickets for a

discounted "net rate," which they can then include with their "attraction pass." *Id.* Access to the most popular attractions is highly valuable. *Id.*

In that action, Go New York alleged that Big Bus and Gray Line had acted in concert to deny Go New York access to critical trade partners, both shutting Go New York out of the market for attraction passes and setting prices for attraction passes. A. 68-74. Go New York alleged that Respondents did this by (1) entering "exclusive" trade partner agreements with certain attractions, which they then waived for the benefit of the other party, (2) refusing to work with attractions who also worked with Go New York and (3) denigrating Go New York's services to those attractions. *Id.*

However, unlike the present case, in the prior antitrust litigation Go New York did not allege the existence of a written agreement among Respondents, nor did it allege that Respondents had merged their operations. The first amended complaint was dismissed by the Honorable Lewis Kaplan without prejudice, with leave for Go New York to replead. A. 88.

Judge Kaplan's stated reasons for dismissing Go New York's Sherman Act §1 claim included that Go New York had not provided direct evidence of a horizontal agreement or alleged sufficient "plus factors" to give rise to an inference of a horizontal conspiracy to restrain trade. A. 85-86. Judge Kaplan specified that "'Plus factors can include 'a common motive to conspire, evidence that shows that

the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications.'" *Id.* (*quoting Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,* 709 F.3d 129, 136 (2d Cir. 2013). Judge Kaplan dismissed Go New York's Sherman Act §2 claim on the grounds that a monopoly requires a single monopolist and that "Section 2 does not permit a 'shared monopoly…'" A. 87-88.

On December 5, 2019, Go New York filed a second amended complaint in that action which also focused on Respondents' exclusive arrangements with non-party attractions and correspondingly depriving Go New York access. A. 90-117. Notably, that complaint omitted the previous claims for monopolization in violation of §2 of the Sherman Act. On March 4, 2020, Judge Kaplan dismissed the second amended complaint for many of the same reasons he dismissed the first, namely lack of direct evidence of a horizontal agreement or specific "plus factors" to infer a conspiracy to restrain trade.[3] A. 119. This Court affirmed Judge Kaplan's decision.

## II.  The Instant Action

After learning that Respondents entered into post-pandemic agreements merging their operations in an attempt to monopolize the market, Go New York

---

[3] Judge Kaplan dismissed Go New York's Donnelly Act claims without prejudice. Go New York renewed those claims as counterclaims in New York State Court. *See Taxi Tours Inc. et al, v. Go New York Tours Inc. et al,* New York County Supreme Court Index No. 653012/2019. While the lower New York Courts dismissed those counterclaims, the Court of Appeals reversed the lower courts and reinstated them in March of 2024. *See Taxi Tours Inc. v. Go New York Tours, Inc.,* 41 N.Y.3d 991, 993, 236 N.E.3d 159, 160 (2024). They are presently being litigated.

brought the current action. Go New York's Amended Verified Complaint (the "Amended Complaint") contains fundamentally different claims and allegations from those in the proceeding antitrust litigation. In the prior action, Go New York alleged primarily only a conspiracy and combination in restraint of trade in the New York City Hop-on, Hop-off Market. A. 90-117. Indeed, Go New York's previous Second Amended Complaint upon which the final dismissal was based on, *did not* allege a violation of §2 of the Sherman Act. *Id.*

In sharp contrast, in the present action, Go New York alleges actual and attempted monopolization as well as a restraint on trade of the New York City hop-on, hop-off market, under both §§1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, and Section 4 of the Clayton Act, 15 U.S.C. §15 A. 308-311. Go New York also alleges similar claims under New York's corollary state antitrust laws, the Donnelly Act. A. 313. The present action is predicated upon Go New York's discovery of agreements and observations (supported by photographic evidence) of conduct on the streets in the New York market pursuant to which Big Bus and Gray Line merged their New York operations. A. 298-299. As alleged by Go New York, Big Bus and Gray Line now operate as a single, monopolistic entity in the New York City hop-on, hop-off market, fixing prices and restraining competition in the New York City hop-on, hop-off market. *Id.*

### A. The Motion to Dismiss

On or about September 20, 2023, Respondents moved to dismiss this action. On or about October 11, 2023, Go New York both opposed the motion to dismiss and filed an amended complaint in lieu of its original one (the "Amended Complaint"). A. 281-316 The Amended Complaint did not substantially change Go New York's core allegations, rather, it added more detail to Go New York's allegations and included additional evidence supporting them. *Compare* A. 15-43 *with* A. 281-316.

Respondents again moved to dismiss Go New York's Amended Complaint, on or about November 13, 2023. A. 319. Respondents' motion was based primarily on a declaration from one of Big Bus' executives, Julia Conway, wherein Ms. Conway attached a "Memorandum of Understanding" (the "MOU") between Big Bus and Gray Line, and declared that "This is the 'written agreement' referenced—although mischaracterized—in Paragraph 44 and 55 of the Amended Verified Complaint." A. 321. Go New York rigorously disputes that the MOU was the entirety of the agreements among Respondents referenced in its Amended Complaint. Indeed, Go New York's Amended Complaint included allegations of additional agreements among Respondents necessary for implementing the merger. A. 298-301. Ms. Conway's assertion that the MOU was the only agreement among Respondents conflicts with several clear allegations in the Amended Complaint and therefore raises material issues of disputed facts. Yet the District Court

accepted Ms. Conway's allegations as true, which was plainly improper on a motion to dismiss.[4]

The MOU attached to the Conway Declaration is referred to by Respondents and the District Court as "reselling arrangement" whereby a subsidiary of Gray Line, Twin America, agreed to sell tickets for Big Bus' hop-on, hop-off bus tours in New York City. A. 321. According to its text, its original term was only six months, and it contemplated Big Bus granting Gray Line a "non-exclusive, royalty-free, worldwide, revocable license to use its Intellectual Property solely to the extent necessary for the resale of tickets…" A. 48-49. Go New York's Amended Complaint, however, alleged that the MOU was one component among several agreements, oral and written, pursuant to which Respondents merged their operations. A. 281 In this regard, even Respondents admit that four years after they first entered into the MOU (which included a term of only six months (A.48)), they continue to operate together under the MOU. As alleged in the Amended Complaint, there is substantial evidence demonstrating that Respondents entered into other agreements pursuant to which they have merged their operations. A. 297-300.

Perhaps most important of all, it is undisputed that subsequent to entering into the MOU and continuing to date, only Big Bus has continued to operate tour

---

[4] While it was proper for the District Court to consider the MOU on the motion to dismiss, the District Court clearly erred insofar as it relied on Ms. Conway's assertion that the MOU was the only relevant agreement among Respondents, and was nothing more than a ticket selling agreement.

buses, and Gray Line has ceased operating buses. A. 299. Thus, one combined entity now operates buses that service customers who hold tickets sold on websites and otherwise by Gray Line and Big Bus. A. 299. While Gray Line continues to sell tickets for its own Attraction Passes, *all* of Gray Line's customers travel on Big Bus' buses. Neither party disputes that Gray Line no longer runs buses -- which is not a required provision in the MOU. *Compare* A. 48-49 *with* A. 298-299. Examining the facts on the ground in fair context, and as alleged in the Amended Complaint, it is abundantly clear that in the New York City hop-on, hop-off market, Gray Line and Big Bus have effectively combined their businesses into a single operating entity. Many other facets of the business relationship among Respondents also go far beyond the explicit terms of the MOU.

For instance, crucially, each of the parties licensed their trademarks and brand names for use by the merged entity. Although the MOU only explicitly contemplates *Gray Line* using *Big Bus's* intellectual property "solely to the extent necessary for the resale of tickets," (A. 49), the merged entity has resulted in the use of the famous brand names of both parties to drive sales. A.297. Indeed, for example, the Amended Complaint asserts, with photographic evidence included in the text of the Amended Complaint, that *Big Bus* has been putting *Gray Line's* logo in prominent places on its buses, publicly holding out its operations as one joint integrated entity in the New York City hop-on, hop-off market. *See* Amended

Complaint, A. 298-299. Both Big Bus and Gray Line have modified their respective websites and marketing materials to take advantage of the power of the combination of their famous brands. A. 300. Coordination of their joint operation so that it benefits from the fame of the pre-existing famous brands of both companies is a key component of Respondents' attempt to monopolize the market.

As alleged by Go New York, in addition to the foregoing, Gray Line permitted Big Bus to use bus stops previously assigned for exclusive use of Gray Line by the New York City Department of Transportation ("DOT"). A. 299. To confer this valuable benefit on the merged entity, Gray Line falsely represented to the DOT that it intended to resume its hop-on, hop-off operations, when in fact, Gray Line had already merged its hop-on, hop-off bus operations with Big Bus, and had no intention to separately resume operation of buses. *Id.* Gray Line made these misrepresentations to the DOT in order confer on the merged entity its exclusive rights to the DOT-assigned bus stops. *Id.* Gray Line's misrepresentations to the DOT concerning its operating status were made for the purpose of conferring monopoly power on its merged entity with Big Bus.

Furthermore, the process of ticket selling itself involves allocating money through several channels. A. 300 Not only do Big Bus and Gray Line work together to allocate revenues among the stakeholders of the new joint partnership, but Respondents must also cooperate in the payment of commissions to sales

representatives and others responsible for selling tickets for the benefit of the new joint enterprise. *Id.* Thus, as alleged in the Amended Complaint, Big Bus and Gray Line necessarily also integrated together accounting and management functions. *Id.* In addition, each of Gray Line and Big Bus has adjusted its websites and other key marketing materials in order to facilitate their merged operations, making references to their combined famous and powerful trademarks and notifying customers and trade partners that only buses operated by Big Bus are available to carry passengers. *Id.*

Go New York also alleged that that the merger of Big Bus and Gray Line resulted in an intensification and expansion of the previous conspiracy to restrain trade in the attraction pass market alluded to above. A. 300. Indeed, the hop-on, hop-off bus tour is a central part of the attraction pass products, as it is the core offering which transports passengers between attractions. Gray Line ceasing its own hop-on, hop-off bus tour while putting all its customers on buses run by Big Bus itself is a dramatic escalation in the coordination regarding Respondents' respective attraction passes, to say nothing of the other subsidiary agreements to restrain trade that were previously alleged by Go New York.

As discussed below, a fair reading of the District Court's opinion must inevitably lead to the conclusion that the District Court simply ignored most of the foregoing allegations, instead crediting the assertion in the Conway Declaration

that the MOU was a mere ticket selling agreement, and that the MOU was the only agreement among Respondents. The Amended Complaint clearly alleges, however, that Respondents' conduct on the ground shows that they entered into several agreements, the essence of which was to combine their operations into a single operating entity. A. 297-300, 308-310.

### B.    The Order Appealed From

In an opinion and order of August 27, 2024, Judge Ramos dismissed Go New York's Amended Complaint, relying primarily on Respondents' representations concerning the allegedly limited scope of their agreements pursuant to the MOU. SPA. 1-20.[5] Specifically, Judge Ramos held that:

> Go New York's new factual allegations do not support its causes of action. First, the MOU does not plausibly support the antitrust claims. To summarize, Go New York alleges that the MOU resulted in the merger of Defendants' companies and formalized Defendants' alleged conspiracy "to monopolize and fix prices within the market for New York City Hop-on, Hop-off tour bus services, and to effectively shut Go New York out of the Attraction Pass sub-market, making it difficult if not impossible for Go New York to offer and sell competitive attraction passes." ¶¶ 44, 61. But the text of the MOU fails to support these allegations, as it only describes an agreement for Gray Line to resell tickets for Big Bus tour bus services and to license intellectual properly "solely" to the extent necessary for such resale. *See* Doc. 53-1. The MOU does not purport to combine or merge Defendants' businesses into a "single entity," nor does it reflect an agreement between Defendants "to fix prices" and prevent competition in the tour bus and multi-attraction pass industries in New York City. Doc. 71 at 26. Go New York's claim that the MOU "formalize[s] and extend[s] a pre-existing conspiracy among Big Bus,

---

[5] Citations to the Special Appendix which includes the order appealed from are in the "SPA []" format.

Gray Line and Go City to deny Go New York access to critical trade partners within New York City," *id.* at 11, is also implausible. The MOU, by its own terms, expressly excludes third-party attractions from its scope. *See* Doc. 53-1 at 2.

Second, Go New York's reference to "subsequent related operating agreements" fails to bolster its argument. The allegations are wholly conclusory. The First Amended Complaint does not allege the terms of these agreements, the parties to them, when they were entered into, or even their subject matter. ¶ 56. *See Iqbal*, 556 U.S. at 662 (citing *Twombly*, 550 U.S. at 544) (pleadings must allege facts that are plausible and not merely conclusory statements)…

SPA. 15-16.

## SUMMARY OF THE ARGUMENT

"In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor." *Williams v. Richardson*, 425 F. Supp. 3d 190, 200 (S.D.N.Y. 2019) (*citing Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007)). However, in this case, the District Court did the *opposite*, discarding Appellant's allegations because it felt they were *improbable* and instead adopting Respondents' position -- essentially drawing inferences in Respondents' favor. Go New York's allegations that Respondents had merged their New York hop-on, hop-off operations were well pled, based on observations concerning on the ground conduct supported by photographic evidence, and detailed factual allegations concerning agreements regarding the sharing of intellectual property, combined on-the-ground bus operations, sharing of bus stops, website notifications to

15

customers and trade partners concerning the combined bus operations, accounting mechanisms and procedures, and other key infrastructure. A. 297-301. Go New York's Amended Counterclaims even included *photographs* which supported Go New York's on-the-ground observations concerning Respondents' combined bus operations and sharing of their combined famous brand names. A. 298-299. Instead, the District Court mischaracterized Go New York's claims and accepted *Respondents'* conclusory and implausible allegations that the relationship between the Respondents was a mere ticket reselling agreement – contentions that in fair context, simply make no sense and directly contradict the evidence on the ground, and as alleged in the Amended Complaint. SPA. 15. In so doing, the District Court compounded its error by heavily relying upon a Big Bus executive, Julia Conway's, unsupported declaration that entire relationship among Respondents was memorialized the MOU, a position that was both conclusory *and* implausible, as the MOU does not even accord with the *facts on the ground*, much less the facts as alleged by Go New York. *Compare* A. 48-49 *with* A. 298-299. While the District Court could properly review the MOU at the pleading stage, reliance on Conway Declaration and the text of the MOU to refute Go New York's well-pleaded merger allegations was clearly improper, resulting in premature, impermissible findings of fact.

The District Court's flawed analysis is evident when one examines the text of the MOU compared to the allegations in the Amended Complaint. For instance, by its terms, the MOU was only a six-month agreement (A. 48) – yet it is undeniable that Respondents have has continued to jointly operate, in part pursuant to the terms of the MOU, for more than four years. It is also undeniable that at the same time the MOU was entered into, Gray Line ceased operating buses, and Big Bus began to carry *all* of Gray Line's customers – yet the MOU is silent concerning this development. *Compare* A. 48-49 *with* A. 297. However, the Amended Complaint alleges that, separate from the MOU, Respondents agreed that Gray Line would cease operating buses and only Big Bus would continue to operate buses on behalf of their merged operations. A. 297. Moreover, the Amended Complaint alleges numerous other agreements between Big Bus and Gray Line, such as an agreement to cross-license intellectual property for use in both the merged entity and with partner attractions, as well as agreements involving the apportionment of revenue from the merged operations. A. 299-300. It is undisputed that *the pictures* included in the Amended Complaint reflect a far greater shared use of Respondents' respective famous brand names, and far greater coordination in the use of their brand names than was authorized by the text of the

MOU (A. 298-299)[6] – yet the District Court accepted Respondents' position that their relationship was a mere ticket reseller agreement. SPA. 18.

The District Court accepted Conway's position that the relationship between Respondents was a mere ticket reselling agreement based on its assertion that Go New York allegedly failed to supply "the terms of [subsequent] agreements, the parties to them, when they were entered into, or even their subject matter." It was error for the District Court to label Go New York's allegations "conclusory" when Go New York's allegations lacked details regarding the *nature* of the merger but had ample details regarding the merger's *outcomes*. Indeed, this Court has said that it is incorrect to "argue that *Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010). In this case, the District Court missed the forest for the proverbial trees, focusing not on the *effects* of the merger in the market but the *process* of how the merger was effectuated.

The District Court incorrectly accepted Respondent's position that the relationship between the parties was a mere "ticket reselling agreement," (SPA. 15) essentially drawing inferences in favor of *Respondents* solely based on one of their executive's unsupported contentions regarding the process of implementing the merger, but it did not afford any favorable inferences to *Appellant's* well-plead

---

[6] The MOU authorized Gray Line to use Big Bus intellectual property such as brand names, but it did not authorize Big Bus to use Gray Line's intellectual property. But in practice, as alleged in the Amended Complaint, the combined entity uses both sets of famous brand names to drive customer sales.

allegations based off the *outcomes* of the merger. The Court's refusal to grant Appellant favorable inferences and instead granting Respondents favorable inferences was clear, reversible error. [7]

## **ARGUMENT**

The applicable standard of review when examining a grant of a motion to dismiss is *do novo*. *See Muto v. CBS Corp.*, 668 F.3d 53, 56 (2d Cir. 2012)("We review *de novo* a district court's grant of a motion to dismiss, accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of the plaintiffs…").

## I. *Twombly* Does Not Permit A Court to Impose a Probability Requirement at the Pleading Stage

The Supreme Court's seminal holding in *Bell Atlantic v. Twombly,* 550 U.S. 544 (2007) empowering courts to dismiss claims on the grounds that they were not "plausible" was sound policy insofar that it permitted courts to discard frivolous litigation at the outset. However, since that holding, court of appeals around the country, including this Court, have noticed a pattern of district courts misapplying the "plausible" standard, and instead applying a standard closer to the summary judgment standard of probability, especially in antitrust cases. *See Anderson News,*

---

[7] To the extent that the District Court relied on *res judicata* in dismissing Go New York's arguments, that was clear error as well, as the merger had not taken place when Go New York brought its other claims.

*L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189–90 (2d Cir. 2012)("the question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible. As discussed in Part II.A. above, the plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation of a defendant's words, gestures, or conduct."); *Davis v. Metro N. Commuter R.R.*, No. 23-1041-CV, 2024 WL 1434284, at \*2 (2d Cir. Apr. 3, 2024). *See also SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1121 (9th Cir. 2022)("But because we do not consider the Board Actors' competing facts at the pleadings stage, and because Rule 12 does not require the Complaint to exclude the possibility of lawful conduct, we hold that the Complaint plausibly alleges a conspiracy to restrain trade."); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) ("*Twombly* also clarified that '[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.' 550 U.S. at 556, 127 S.Ct. 1955. It is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder. "); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 434 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29,

2015) (reversing a dismissal of a Sherman Act claim because "the district court…
erred by applying a summary-judgment standard to SawStop's group boycott claim
and by confusing 'plausibility' with 'probability.'"). As expressed in the quotations
above, the misapplication of *Ashcroft* and *Twombly* most often takes the form of
deciding a critical disputed issue of material fact which implies plausible
competing inferences in favor of the defendant, not the plaintiff. That is precisely
what occurred in this case.

## II.    Go New York Plausibly Alleged Respondents Merged Their Operation

"A claim has facial plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the defendant is liable for the
misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Appellant
advanced facially plausible allegations that Respondents had conspired to restrain
trade in and monopolize the New York City hop-on, hop-off market, as the
following key facts all support a reasonable inference that Respondents had
effectively merged their New York City hop-on, hop-off operations:

- Gray Line agreed that it would not operate hop-on, hop-off tours, and has
  ceased operating those tours. A. 296-297. Indeed, Gray Line has auctioned
  off its hop-on, hop-off bus fleet in New York.

- Between Gray Line and Big Bus, only Big Bus is operating buses, and for four years or more, continuing to date, all customers of the merged entity ride on buses operated by Big Bus, regardless of if they technically buy tickets from the website of one corporate Respondent or the other. *Id.*

- These allegations cannot be disputed; indeed the Amended Complaint even includes *pictorial evidence* showing buses currently running in New York City bearing both Gray Line and Big Bus' famous logos. A. 298-299.

- Gray Line misrepresented its operating status to the New York City Department of Transportation (the "DOT") to ensure that the DOT would not reassign the bus stops assigned to it. Access to the bus stops is extremely valuable. Had Gray Line been forthright that it was no longer operating buses, the DOT would have reassigned these bus stops to a competitor, potentially Go New York. A. 299-300. Instead, Gray Line permitted Big Bus to stop at its stops, showing how the merged entity was able to utilize the combined market power of both corporate Respondents to shut others out of the market. *Id.*

- The Amended Complaint also alleged other operating agreements necessary to effectuate the merged operation evidenced in the pictures included in the Complaint. A. 298-299. These operating agreements included:

o Agreements involving the cross-licensing of trademarks and intellectual property. The Amended Complaint's pictures show the merged operation using both Gray Line and Big Bus' famous, trademarked, brands. A. 297. Indeed, the heart of the Amended Complaint is that in the New York City hop-on, hop-off market, Gray Line and Big Bus run buses with each other's famous trademarks on them, while in other cities, Big Bus and Gray Line are still ostensible competitors. A. 297-299. This is no small detail – it is as though Coca-Cola and Pepsi, or Microsoft and Apple, agreed to place their valuable intellectual property on one soda or one electronic device. The fact that two ostensible direct competitors have agreed to share famous and valuable trademarks leads to the obvious conclusion that discovery would likely reveal the existence of either an oral or formal written agreement regarding the use of these trademarks. However, the Court merely ignored this fact and the pictures in the Complaint which prove it.

o Agreements involving the sharing of revenue from the combined operations. Big Bus and Gray Line each operate their own attraction pass but are also investors in the combined operation. A. 300. The parties must have an agreement regarding revenue derived from buses and derived from attractions according to their respective investments in the

combined operation. Furthermore, not only do Big Bus and Gray Line work together to fairly allocate revenue, but critically, as alluded to above one of the key sales channels for hop-on, hop-off tours and Attraction Passes are sales representatives who work on commission. *Id.* Because the sales representatives' commissions are based on the amount of sales they make, Big Bus and Gray Line must work together in the merged entity in order to fairly allocate commissions to their uniformed salespeople. *Id.* Discovery would likely reveal the details concerning these agreements, which are obviously necessary for the joint operations between Big Bus and Gray Line.

- The District Court also ignored that, as alleged by Go New York, a major impact of this merger was to formalize and extend a pre-existing conspiracy among Big Bus, Gray Line and Go City to deny Go New York access to critical trade partners within New York City, thereby (a) either shutting Go New York out of the Attraction Pass market or making it extremely difficult if not impossible for Go New York to compete in the Attraction Pass market, and (b) fixing the prices of Attraction Passes such that none of Big Bus Gray Line or Leisure Pass would undercut each other on prices for comparable Attraction Passes. A. 300-301. Critically, it appears that the District Court failed to appreciate that hop-on hop-off tours are *the* core component of the Attraction

Pass – they are of course what transports customers between attractions. The fact that Big Bus and Gray Line (ostensibly) offer separate Attraction Passes featuring the same or similar routes and groups of tourist attractions *necessitates* a great deal of coordination. For instance, Gray Line must ensure that Big Bus' buses stop at all of the attractions that are included in its attraction pass products, Big Bus must ensure its employees know the Gray Line attractions in addition to its own, and the merged operation will need to coordinate dropping off passengers from both corporate entities at locations of different attractions which are included in their respective attraction pass products.. All of these developments necessitate at least close communications, and most likely written agreements, which discovery would reveal.

However, the District Court ignored all of these allegations and instead misstated them. The District Court wrote: "To summarize, Go New York alleges that the MOU resulted in the merger of Defendants' companies and formalized Defendants' alleged conspiracy 'to monopolize and fix prices within the market for New York City Hop-on, Hop-off tour bus services…" SPA. 14. That was *not* Go New York's allegation, rather, that was Respondents' mischaracterization and misrepresentation of Go New York's allegations, primarily advanced by the declaration of Julia M. Conway. A. Go New York has never alleged that the merger grew solely from the MOU. To quote this Court, the assertion by

Respondents that the MOU is the sole agreement relating to the alleged merger "is a disputed factual issue that must be reserved for the proof stage." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 776 (2d Cir. 2016) (reversing a dismissal of a Sherman Act claim). The District Court, thus, ignored numerous allegations in the Amended Complaint concerning how Respondents merged their operations, and their various agreements other than the MOU for implementing this merger. Go New York plausibly alleged that the facts on the ground demonstrated that a merger had taken place, even including in the Amended Complaint photographs showing how the parties had merged their operations and shared the valuable and famous brand names for use in the merged operation.

## III. The District Court Wrongly Resolved Competing Inferences in *Respondents' Favor*

In her declaration, Ms. Conway declares that the MOU "is the 'written agreement' referenced— although mischaracterized—in Paragraph 44 and 55 of the Amended Verified Complaint." A. 46. Crucially, nowhere does Ms. Conway state that the MOU is the *only* written agreement between the parties, (*id*) however, the District Court wholly adopted Conway's conclusory and implausible allegations.

Conway's declaration is fundamentally misleading, and the District Court's reliance on it was clear error. The Amended Complaint clearly alleges that there

are agreements other than the MOU pursuant to which Respondents merged their operations. For example, although the MOU contemplates Gray Line using Big Bus' intellectual property "solely to the extent necessary for the resale of tickets," it did not authorize Big Bus to use Gray Line's intellectual property. A. 47-48. However, as demonstrated in photographs contained in the Amended Complaint, the buses operated in Respondents' joint operation make use both the Grey Line and Big Bus brand names.  This clearly demonstrates an agreement that goes far beyond the text of the MOU. This is one of merely many concrete factual allegations in the Amended Complaint that the District Court ignored or discounted, impermissibly accepting Respondents' assertion that there was no merger and that the MOU is their only agreement. *See Anderson News, L.L.C.*, 680 F.3d at 185 (Reversing a dismissal of an antitrust claim because "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."); *Gelboim,* 823 F.3d at 776.

The MOU is also silent regarding Gray Line ceasing to operate buses, and Big Bus operating buses on behalf of both itself and Gray Line. A. 47-48. It also makes no reference to the sharing of bus stops between Big Bus and Gray Line. *Id.* By its terms, the MOU was only valid for a period of six months – but the merged operation has been running for over four years. *Id.* The MOU does not come close

to explaining the facts on the ground, both as alleged by Go New York and photographic evidence included in the Amended Complaint. A. 297-300. Therefore, it was fundamentally improper for the District Court to accept Respondents' assertion at the pleading stage that there was no merger, and that the MOU was the only relevant agreement among Respondents. *See Davis*, 2024 WL 1434284, at *2 ("At the pleading stage, the court must accept the allegations in the complaint as true, unless they are conclusory and contradicted by extrinsic material incorporated into the complaint. Additionally, courts must resolve competing inferences in plaintiff's favor at the pleading stage…" (internal citations omitted)).

The District Court was seemingly preoccupied with the MOU, when it should have focused on Go New York's allegations themselves. Indeed, it appears that the Court's error was partially based on the mistaken belief that "*Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation. This is also incorrect." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010). The Court rejected Go New York's claims that the Respondents had engaged in an anticompetitive merger because "The First Amended Complaint does not allege the terms of these agreements, the parties to them, when they were entered into, or even their subject matter." However, as this Court has stated: "conspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through inferences that may fairly be drawn from the

behavior of the alleged conspirators…" *Anderson News, L.L.C.* 680 F.3d at 183–84 (internal citations and quotations omitted). Indeed, this Court has recognized that it is unrealistic to require plaintiffs to supply details regarding the background of knowing tortious conduct prior to the pleading stage. *Id. See also Barnes v. City of New York*, 68 F.4th 123, 129 (2d Cir. 2023)("it is unclear what other facts Barnes could be expected to allege in order to show that Defendants' conduct was knowing, as opposed to mistaken…")

## IV. Go New York Stated a Claim for Monopolization and Attempted Monopolization

A claim under §2 of the Sherman Act must allege: "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *TechReserves Inc. v. Delta Controls Inc.*, No. 13 CIV. 752 GBD, 2014 WL 1325914, at *9 (S.D.N.Y. Mar. 31, 2014) (*quoting Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 73 (2d Cir. 1988)). Monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998).

Go New York has clearly and plausibly alleged *both* conditions precedent to acquiring monopoly power. Go New York has adequately alleged that Respondents merged their New York hop-on, hop-off operations to fix prices *and* exclude Appellant from competing with them. As alleged by Go New York, prior to the merger, there were three companies operating in the New York Hop-on, Hop-off Market, Big Bus, Gray Line, and Go New York. A. 288. The Amended Complaint alleges that immediately prior to their merger, "Gray Line had been the largest hop-on, hop-off, sightseeing company operating in New York City, in terms of both sales revenue and the size of its bus fleet…" A. 289. Similarly, as alleged by Go New York, "Big Bus had owned and operated the second largest hop-on, hop-off sightseeing tour bus business in New York City." A. 290. Thus, Go New York trailed Big Bus and Gray Line. *Id.* When Respondents merged their operations, they acquired monopoly power in the New York hop-on, hop-off market. Given that, as alleged by Go New York, there were three players in the New York hop-on, hop-off market, and that Gray Line and Big Bus were the first and second largest respectively, their merger must have resulted in a substantial, dominant market share. A. 288-291. Such a substantial market share is "strong evidence" of monopoly power. *See Tops Markets, Inc.* 142 F.3d T 99 ("We have held that a market share of over 70 percent is usually "strong evidence" of monopoly power").

But it is not only Respondents' respective market shares that cry out for an inference in favor of monopoly power. As this Court has stated "…there is little argument over the principle that existence of monopoly power, the power to control prices or exclude competition, is the primary requisite to a finding of monopolization." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979). Central to Go New York's allegation of monopolization is the fact that, as alleged by Go New York:

> Another major impact of this merger was to formalize and extend a pre-existing conspiracy among Respondents to deny Go New York access to critical trade partners within New York City, thereby (a) either shutting Go New York out of the Attraction Pass market or making it extremely difficult if not impossible for Go New York to compete in the Attraction Pass market, and (b) fixing the prices of Attraction Passes such that none of Big Bus, Gray Line or Leisure Pass would undercut each other on prices for comparable Attraction Passes.

A. 300. While Judge Kaplan initially dismissed Go New York's theory of monopolization as unviable because "Section 2 does not permit a shared monopoly…" (A. 86), the fact that Big Bus and Gray Line have merged their operations fundamentally changes the calculus. Go New York's theory of monopolization is *not* based on the preexisting conspiracy – rather, it is based on the merger, and the preexisting conspiracy is merely further evidence that Respondents possess the power to control prices and exclude competitors – e.g., monopoly power.

## V. Go New York Has Adequately Alleged a Conspiracy to Monopolize Under §2 of the Sherman Act

"A conspiracy to monopolize claim must allege: (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize.'" *TechReserves Inc.* 2014 WL 1325914, at *9 (*quoting Volvo N. Am. Corp.* 857 F.2d at 74). The standard for "concerted action" is the same for both §1 and §2 of the Sherman Act. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). Clearly, two competitors merging their operations is concerted action, and there can hardly be a stronger "overt act" than an actual MOU itself. As for the third element, "It need not be shown that monopoly power has been attained, nor that if the conspirators continued in their course unmolested they would have attained it, but only that obtaining such power is the purpose which motivates the conspiracy." *Fort Wayne Telsat v. Ent. & Sports Programming Network*, 753 F. Supp. 109, 113 (S.D.N.Y. 1990) (internal citations and quotations omitted). The Amended Complaint plausibly and adequately alleges each of these elements. Respondents have merged their operations into a single entity and formed a joint venture with the intent to monopolize the relevant market. A. 297-300. At the pleading stage, Go New York's allegations are both credible and plausible.

## VI. Go New York Plausibly Alleged a Conspiracy In Restraint of Trade

In the alternative, if this Court deems that Go New York has not adequately alleged a monopoly or attempted monopoly, at the very least Appellant has alleged a concerted restraint on trade in violation of §1 of the Sherman Act and the Donnelly Act. Specifically, Go New York alleges that pursuant to their merger, Respondents have unreasonably conspired to restrain trade by fixing prices and entering into allegedly "exclusive" relationships with third-party attractions, which they then share amongst themselves, but refuse to allow to do business with Go New York. A. 300-301. As stated by this Court:

> A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed. As *Starr* suggests, there are two ways to do this. First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws…a complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed. …These plus factors may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications.

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (internal citations and quotations omitted).

## A. Go New York Has Plausibly Alleged an Actual Agreement in Restraint of Trade

Go New York has alleged "direct evidence," of a horizontal agreement to share allegedly exclusive attractions and otherwise fix prices in the New York City hop-

on, hop-off market, as the MOU and the other related agreements among Respondents alleged in the Amended Complaint are actual agreements in restraint of trade. A. 297-300. But Go New York alleges much more. As alleged by Go New York, Respondents merged their operations, licensing their intellectual property to the merged entity and agreeing to numerous other operating and marketing arrangements. *Id.* Therefore, because Go New York's allegations plausibly suggests agreements to unreasonably restrain trade, Appellant's §1 Sherman Act claims must not be dismissed either.

### B. Go New York has Plausibly Alleged Plus Factors to Infer a Restraint of Trade

At the very least, even if the MOU is not itself direct evidence of an anticompetitive conspiracy, when combined with the other new allegations in Go New York's Amended Complaint, they present "plus factors" sufficient to give rise to an inference of a conspiracy. To recap, the *new* critical allegations by Go New York are:

- The MOU and other agreements entered into among Respondents beginning in Summer of 2020, resulting in the merger of their operations in New York into a new entity. A. 297.

- Gray Line completely ceasing operation of buses in New York and relying solely on buses operated by Big Bus to service customers of the merged entity. A. 297-299.

- Gray Line's false assertions to DOT that it was still operating hop-on hop-off buses, thereby refusing to give up its assigned bus stops, while simultaneously permitting buses operated by Big Bus to service the merged entity to use Gray Line's previously assigned bus stops. *Id.*

- The cross-licensing and joint use of the famous trademarks and brand names of Big Bus and Gray Line.  *Id.*

- Allegations of an explicit agreements among Respondents to share access to third-party attractions with each other, while agreeing to exclude Go New York. A. 300-301.

 These plus factors are more than sufficient to plausibly allege a conspiracy in restraint of trade. See *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("These plus factors may include: a common motive to conspire…evidence of shared economic interest and a high level of interfirm communications").

 It would be hard to conceive of a stronger common motive to conspire than an agreement whereby alleged competitors sell tickets for use by customers in a combined operation. Indeed, under the terms of the MOU as presented by

Respondents, Big Bus clearly has a vested interest in continuing to benefit from the fame of Gray Line's branding and accompanying reputation. A. 48-49. And, because Gray Line is no longer operating hop-on, hop-off buses, it has a vested interest in making sure that it can send its customers to ride buses operated by Big Bus. Further, as previously alluded to, each of Respondents now has a vested interest in sharing allegedly "exclusive" third-party attractions, as well as excluding Go New York from access to such attractions. Thus, the Amended Complaint contains plausible and clear allegations of plus factors giving rise to an inference of a conspiracy to restrain trade in violation of §1 of the Sherman Act.

## <u>CONCLUSION</u>

For all the above reasons, the District Court's order granting Respondents' motion to dismiss should be reversed in its entirety.

Dated: New York, New York
      November 11, 2024

**BARTON LLP**

**By:**   ***/s/ Maurice N. Ross /s/***
      Maurice N. Ross
      Barak F. Bacharach


711 Third Avenue, 14th Floor
New York, NY 10017
(212) 687-6262
mross@bartonesq.com
bbacharach@bartonesq.com
*Attorneys for Appellant*
*Go New York Tours, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type volume limitations of FRAP 32 (a)(7)(B) because this brief contains 8936 words, according to the Microsoft Word Software it was prepared upon.

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because this brief has been prepared in a: proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: New York, New York    **BARTON LLP**
   November 11, 2024

                ***By:*** _**/s/ Maurice N. Ross /s/**_
                 Maurice N. Ross
                Barak F. Bacharach

                711 Third Avenue, 14th Floor
                New York, NY 10017
                (212) 687-6262
                mross@bartonesq.com
                bbacharach@bartonesq.com
                *Attorneys for Appellant*
                *Go New York Tours, Inc.*

**SPECIAL APPENDIX**

**<u>Table of Contents</u>**

<u>**Page**</u>

Opinion and Order of the Honorable Edgardo Ramos,
    dated August 27, 2024 ...................................................... SPA1

15 U.S.C. § 1 .................................................................... SPA20

15 U.S.C. § 2 .................................................................... SPA37

Fed. R. Civ. P. 12 ............................................................. SPA38

**SPA1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GO NEW YORK TOURS, INC.,

                              Plaintiff,

              – *against* –

GRAY LINE NEW YORK TOURS, INC.,
TWIN AMERICA, LLC, SIGHTSEEING
PASS LLC, BIG BUS TOURS GROUP
LIMITED, BIG BUS TOURS LIMITED,
OPEN TOP SIGHTSEEING USA, INC.,
TAXI TOURS, INC., LEISURE PASS
GROUP HOLDINGS LIMITED, THE
LEISURE PASS GROUP LIMITED, and
LEISURE PASS GROUP, INC,

                              Defendants.

---

**OPINION & ORDER**

23-cv-4256 (ER)

---

Ramos, D.J.:

       Go New York Tours, Inc., a "hop-on, hop-off" tour bus service that also bundles

admission to numerous New York City tourist attractions, brings this action against three

competitors and related companies:  Big Bus Tours Group Limited, Big Bus Tours

Limited, Open Top Sightseeing USA, Inc., Taxi Tours, Inc. (collectively, the "Big Bus

Defendants"); Go City Holdings (f/k/a Limited Leisure Pass Group Holdings Limited),

Go City Limited (f/k/a The Leisure Pass Group Limited), Go City, Inc. (f/k/a Leisure Pass

Group, Inc.) (collectively the "Go City Defendants"); and Twin America, LLC ("Twin

America"), Gray Line New York Tours, Inc. ("Gray Line") and Sightseeing Pass LLC

("Sightseeing Pass") (collectively the "Gray Line Defendants," and with the entities listed

above, the "Defendants").  Go New York alleges that the Defendants violated multiple

federal and New York state antitrust laws, and asserts a claim for unfair competition

under New York common law.  *See* Doc. 59 (First Amended Complaint).

       Before the Court is Defendants' motion to dismiss the First Amended Complaint

for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doc. 66.

Big Bus Tours Group Limited, Big Bus Tours Limited, Leisure Pass Group Holdings Limited, and The Leisure Pass Group Limited, all of which are incorporated in the United Kingdom (the "Foreign Defendants"), have moved separately to dismiss the First Amended Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Doc. 64. For the following reasons, Defendants' motion is GRANTED and the Foreign Defendants' motion is DENIED as moot.

## I.    BACKGROUND

### A.  Factual Background[1]

#### 1.  The Parties

Go New York launched its New York-based hop-on, hop-off double-decker bus tour business in 2012. ¶ 27. In the approximately 12 years since then, it has grown its bus tour business substantially and also added other related business lines, such as bicycle and boat tours, bike rentals, and multi-attraction passes. ¶¶ 24, 27.

Twin America is the parent company of Gray Line and Sightseeing Pass. ¶¶ 3–5. Gray Line also previously operated hop-on, hop-off double-decker bus tours in New York City.[2] ¶ 30. Sightseeing Pass negotiates with operators of tourist attractions and bundles multi-attraction passes that include bus tours and admission to other attractions. ¶ 43.

The Big Bus and Go City Defendants are commonly owned and controlled by Exponent Private Equity LLP, a U.K.-based private equity firm that is not a party to this case. ¶¶ 6–9, 15. The seven Big Bus/Go City companies include the four Foreign Defendants. ¶¶ 9, 10, 14, 16. The remaining three entities—Open Top Sightseeing USA, Inc., Taxi Tours, Inc., and Go City, Inc.—are incorporated in the United States and operate in New York.[3] ¶¶ 12, 13, 17. Big Bus operates hop-on, hop-off double-decker

---

[1]  Unless otherwise noted, citations to "¶ _" refer to the First Amended Complaint, Doc. 59.

[2]  Gray Line ended its bus tour services in 2020. Doc. 71 at 8.

[3]  Specifically, Open Top Sightseeing USA, Inc. and Go City Inc. are Delaware corporations, and Taxi Tours, Inc. is a New York corporation. ¶¶ 12, 13. 17.

tour buses, and Go City offers multi-attraction passes that include bus tours and admission to other tourist attractions for a single price. ¶¶ 33, 43.

### 2. The Parties' Business in New York City

Go New York and Big Bus (and until the summer of 2020, Gray Line) each operate double-decker tour buses that travel in continuous circuits, allowing customers to "hop off" at the destinations of their choice, and later "hop on" other buses operated by the same tour company to resume their tour and visit other attractions. ¶ 24. The three competitors market their tours through uniformed sales agents stationed near popular tourist attractions, through their respective websites, in their offices and visitor centers, and through hotel concierge services. ¶¶ 37–40.

Go New York, Go City, and Sightseeing Pass each create and sell multi-attraction passes, which bundle admission to multiple tourist attractions and other services throughout New York City using a single ticket sold for a single price. ¶¶ 42–43. For each visitor admitted to a particular attraction, the seller of the multi-attraction pass later pays the attraction operator the admission fee for that visitor, minus a prearranged commission. ¶¶ 45–46. The companies that create and market multi-attraction passes have an incentive to contract with many attractions, so they can offer the most attractive bundled pricing to tourists while still maximizing margins. ¶¶ 43, 45–53.

Go New York competes with Gray Line and the Big Bus Defendants in offering bus tour services to customers in New York City. Go New York also alleges that it competes with Sightseeing Pass and the Go City Defendants in creating and selling multi-attraction passes.

### 3. Prior Federal Action

In March 2019, Go New York filed a civil action against the same Defendants entitled *Go New York Tours, Inc. v. Gray Line New York Tours, Inc.*, No. 19-cv-02832 (LAK) (the "Prior Federal Action"). On May 23, 2019, Go New York filed a first amended complaint in the Prior Federal Action, alleging that the Defendants conspired to

restrain trade in the hop-on, hop-off tour bus and multi-attraction pass markets in New York City by fixing prices and preventing Go New York from securing trade partner agreements with certain tourist attractions with whom Defendants had already partnered. *See* Doc. 56. To support its allegations, Go New York identified nine attractions with which it was unsuccessful at securing agreements: (1) the Top of the Rock at Rockefeller Center, Doc. 56 ¶ 52; (2) the Empire State Building Observatory, *id.* ¶ 53; (3) One World Observatory at the World Trade Center, *id.* ¶ 55; (4) the Intrepid Sea, Air, and Space Museum, *id.* ¶ 59; (5) the 9/11 Memorial and Museum and 9/11 Tribute Museum, *id.* ¶ 60; (6) the Museum of Modern Art, *id.*; (7) Madame Tussauds Wax Museum, *id.* ¶ 61; (8) Broadway Inbound (an online platform for buying tickets to Broadway shows), *id.* ¶ 63; and (9) Coach USA and Short Line's shuttle bus service to Woodbury Common Premium Outlets, *id.* ¶ 64.

Go New York asserted claims for antitrust violations pursuant to §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; § 4 of the Clayton Act, 15. U.S.C. § 15, and the Donnelly Act, New York state's antitrust law, N.Y. Gen. Bus. L. § 340. *Id.* ¶¶ 67–94. The first count alleged Defendants unlawfully conspired to exclude Go New York from trade partner relationships, in violation of the Sherman Act § 1 and Clayton Act § 4. *Id.* ¶¶ 67–78. The second count alleged that Gray Line and Big Bus each possessed monopoly power in the New York City hop-on, hop-off tour bus market and, in violation of the Sherman Act § 2 and Clayton Act § 4, and sought to increase their monopoly positions by working together to exclude Go New York from beneficial trade partner relationships. *Id.* ¶¶ 79–88. The third count alleged that Defendants' conduct violated the Donnelly Act. *Id.* ¶¶ 89–94. Finally, counts four through six asserted state-law claims for unfair competition, tortious interference with contract, and tortious interference with prospective business relations. *Id.* ¶¶ 95–105.

In a Memorandum and Order dated November 7, 2019, Judge Kaplan dismissed Go New York's first amended complaint for failure to state a claim pursuant to Federal

## SPA5

Rule of Civil Procedure 12(b)(6).  Doc. 83.  First, Judge Kaplan rejected Go New York's argument that the Defendants created conspiracies to restrain trade or commerce in violation of the Sherman Act § 1.  Judge Kaplan found the first amended complaint failed to allege the necessary "plus factors" amounting to a horizontal conspiracy.  Doc. 83 at 2–3.  Absent these plus factors, Judge Kaplan found "the closest the [first amended complaint] comes to alleging a horizonal agreement is a conclusory allegation" that defendants unlawfully conspired to exclude Go New York from trade partner relationships.  *Id.* at 2.  Nor was Judge Kaplan persuaded by Go New York's argument that the only rational reason for the trade partners' rejection was due to alleged vertical conspiracies between Defendants and the trade partners, noting "there are many logical and permissible business reasons" for such a rejection.  *Id.* at 3.

Second, Judge Kaplan rejected Go New York's argument that Gray Line and Big Bus each exercised monopoly power in violation of the Sherman Act § 2, stating that the law "does not permit a 'shared monopoly' theory of the kind [Go New York] alleges."[4] *Id.*  Third, noting that Go New York raised an unfair competition claim under New York law which they then withdrew, Judge Kaplan dismissed this claim with prejudice.[5]  *Id.* at 5 n.21.  Fourth, because the complaint did not sufficiently explain how Defendants

---

[4] "Section 2 of the Sherman Act prohibits monopolization, attempted monopolization and conspiracy to monopolize any part of trade or commerce."  *Klickads, Inc. v. Real Estate Board of New York, Inc.*, No. 04-cv-8042 (LBS), 2007 WL 2254721, at *8 (S.D.N.Y. Aug. 6, 2007).  As pled in the Prior Federal Action, Go New York argued that each of Gray Line and Big Bus "possesses monopoly power in the New York City hop-on, hop-off tour bus market[.]"  Doc. 56 ¶ 80.  But as Judge Kaplan pointed out, monopoly power is, by definition, power held unilaterally.  Doc. 83 at 3 & n.12 ("[A]s the prefix 'mono' suggests ... there can only be one monopolist."); *see also H.L. Hayden Co. v. Siemens Med. Systems, Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) ("in order to sustain a charge of monopolization or attempted monopolization, a plaintiff must allege the necessary market domination of a particular defendant.") (citations omitted); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 57 (S.D.N.Y. 2012) ("A claim for conspiracy to monopolize under section 2 requires a showing of . . . proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly[.]").

[5] Specifically, Go New York included a footnote in their opposition brief stating it "withdrew" its unfair competition claim and otherwise did not defend this claim in the brief.  *See* Doc. 76 at 2 n.1.  Courts in this Circuit "routinely dismiss with prejudice claims at the motion to dismiss stage that are not defended and deemed abandoned."  *Alterescu v. New York City Dep't of Educ.*, No. 21-cv-925 (KPF), 2022 WL 3646050, at *4 (S.D.N.Y. Aug. 23, 2022), *appeal dismissed* (Jan. 25, 2023).

induced a breach of contract or induced a breach through wrongful means, Judge Kaplan dismissed the tortious interference with contract and tortious interference with prospective business relations claims. *Id*. at 4–5. Finally, Judge Kaplan dismissed the Donnelly Act claim for the same reasons discussed above. *Id.* at 2 n.5. The November 7, 2019 Memorandum and Order did not reference the Clayton Act § 4 claims.

On December 5, 2019, Go New York filed a second amended complaint in the Prior Federal Action that withdrew the Sherman Act § 2 claim but otherwise asserted the same six causes of action. Doc. 84. In a Memorandum and Order dated March 4, 2020, Judge Kaplan dismissed the second amended complaint. Doc. 92. Judge Kaplan found the Sherman Act § 1 claim was "virtually identical in relevant part" to the previous version of the complaint. Doc. 92 at 1. Because the Sherman Act § 2 claim was not re-alleged in the second amended complaint, Judge Kaplan deemed it "abandoned." *Id.* Finally, Judge Kaplan declined to exercise supplemental jurisdiction over the remaining New York state law claims, including the Donnelly Act claim, which were dismissed without prejudice.[6] *Id*. at 2. Judge Kaplan dismissed the Sherman Act §§ 1 and 2 claims with prejudice.[7] *Id.*

On December 22, 2020, the Second Circuit affirmed Judge Kaplan's dismissal. *See Go New York Tours, Inc. v. Gray Line New York Tours, Inc.*, 831 F. App'x 584 (2d Cir. 2020). On April 26, 2021, the United States Supreme Court denied Go New York's petition for a writ of certiorari. *See Go New York Tours, Inc. v. Gray Line New York Tours, Inc.*, 141 S. Ct. 2571 (2021).

---

[6] Go New York renewed the Donnelly Act claim as counterclaims in a pending action in New York State court. *See Taxi Tours Inc. et al, v. Go New York Tours Inc. et al*, New York County Supreme Court Index No. 653012/2019.

[7] The March 4, 2020 Memorandum and Order did not expressly include the Clayton Act § 4 claims in its analysis.

4.  *The 2020 MOU*

In the meantime, Gray Line and Big Bus merged their operations into a "single operating entity" pursuant to an agreement under which Gray Line ceased its tour bus business in New York City and began selling tickets for Big Bus. ¶¶ 54–55. This merger was formalized in a memorandum of understanding signed in August 2020 (the "MOU"), which states in relevant part:

> [Twin America and Gray Line] and [Big Bus] propose to enter into an arrangement pursuant to which [Twin America and Gray Line] will sell sightseeing tour bus tickets and private hire services. The sightseeing tours will be on [Big Bus]'s route network, operated solely by [Big Bus] . . . . [Big Bus] will continue to sell its products through its current distribution channels and at prices determined solely by [Big Bus], as will [Twin America and Gray Line].
>
> [. . .]
>
> As additional core [Big Bus] products[8] (excluding third-party attractions) are added to [Big Bus]'s line-up in the New York City market, they will be made available for re-sale to [Twin America and Gray Line] at a [redacted]% discount of the headline, full-price retail.
>
> [. . .]
>
> [Big Bus] grants to [Twin American and Gray Line] the non-exclusive, royalty-free, worldwide, revocable license to use its Intellectual Property solely to the extent necessary for the resale of tickets[.]

Doc. 53-1 at 2–3.

In order to implement the MOU, Go New York claims that there have been several other agreements between Gray Line, Big Bus, and Go City. As examples, the First Amended Complaint alleges that Gray Line and Big Bus actually cross license trademarks (as opposed to Big Bus allowing Gray Line to use its intellectual property, as described in the MOU), ¶ 56, that Gray Line permitted Big Bus to use bus stops that the New York City Department of Transportation previously assigned for Gray Line's

---

[8] Examples of these products include Big Bus' classic, night tour, and promotional special tickets. Doc. 53-1 at 2.

exclusive use, ¶ 58, and "must" work together to allocate commissions to their respective sale representatives. ¶ 60.

While Go City is not directly named in the MOU, Go New York claims that the merger "formaliz[ed] and extend[ed] a pre-existing conspiracy" among Big Bus, Gray Line, and Go City to "deny Go New York access to critical trade partners" and to fix the prices of attraction passes by not undercutting each other pricing for comparable attraction passes. ¶ 61. As a result of the merger between Gray Line and Big Bus, Go New York claims that consumers have been forced to pay higher prices for attraction passes, and that it has been unable to effectively and fairly compete in the attraction pass market. *Id.*

5. *Allegations Defendants Unreasonably Restrained Trade*

Go New York also alleges that the Defendants entered into horizontal and vertical agreements (with each other, and with tourist attractions and related services) to exclude it from the New York City bus tour and multi-attraction pass markets. ¶¶ 1, 105–111. For example, the First Amended Complaint alleges that both Gray Line and Big Bus have agreements[9] with hotels and/or concierge and guest service providers to market and sell their tour tickets and multi-attraction passes, and Go New York has been "largely shut out of such arrangements and improperly prevented from having its services and products marketed" in this way. ¶¶ 40–41.

Go New York also identified the nine attractions—the same ones referenced in the Prior Federal Action—which it has been unsuccessful in entering into partnerships with. ¶¶ 67–81. For example, Gray Line and Big Bus include admission to "Top of the Rock" in their multi-attraction passes, but Go New York has been unable to negotiate for the inclusion of this attraction in its own multi-attraction pass. ¶ 65. The operator of "Top of the Rock" has "rebuffed repeated attempts by Go New York to establish a relationship

---

[9]  The First Amended Complaint does not state when the agreements were signed.

with it" as a result of "deliberate pressure" by Gray Line and Big Bus to exclude Go New York. ¶¶ 65, 66.  Go New York alleges that Defendants "conspired" with each other and with these attractions to exclude Go New York "for the purpose of rendering Go New York's [a]ttraction [p]asses less attractive to tourists and less competitive."  ¶ 80.

### B.  Procedural Background

Go New York field this action on May 22, 2023.  Doc. 1.  On October 11, 2023, it filed the First Amended Complaint, Doc. 59, which alleges seven causes of action:  (1) monopolization in violation of the Sherman Act § 2 , ¶¶ 86–92; (2) attempted monopolization in violation the Sherman Act § 2, ¶¶ 93–97; (3) conspiracy to monopolize in violation of the Sherman Act § 2, ¶¶ 98–104; (4) unreasonable restraint of trade in violation of the Sherman Act § 1, ¶¶ 105–111; (5) anticompetitive merger in violation of the Clayton Act § 7, 15 U.S.C. § 18, ¶¶ 112–115; (6) unreasonable restraint of trade in violation of the Donnelly Act, ¶¶ 116–121; and (7) unfair competition under New York common law, ¶¶ 122–124.[10]

On November 13, 2023, all Defendants filed their motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and the Foreign Defendants filed their motion to dismiss the complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  Docs. 64, 66.

## II.    LEGAL STANDARD[11]

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences

---

[10]  Each Sherman and Clayton Act claim also alleges violation of the Clayton Act § 4, which relates to the availability of treble damages for antitrust violations.  *See* 15 U.S.C. § 15.

[11]  Ordinarily, courts address challenges to personal jurisdiction before deciding the merits of a cause of action.  *See In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 267–68 (2d Cir. 2001).  However, "in cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, [a court] may address first the facial challenge to the underlying cause of action and, if [it] dismiss[es] the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants."  *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012); *see also In re London*

in the plaintiff's favor. *See Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551, 127 S. Ct. 1955). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The question in a Rule 12 motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)) (internal quotation marks omitted). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

---

*Silver Fixing, Ltd., Antitrust Litig.*, Nos. 14 MDL 2573, 14 Misc. 2573 (VEC), 2018 WL 3585277, at *5 n.5 (S.D.N.Y. July 25, 2018) ("Under the circumstances, the Court exercises its discretion to address [defendants'] motion to dismiss for failure to state a claim before addressing personal jurisdiction.") Because Go New York fails to state a claim, as will be explained, the Court declines to address the Foreign Defendants' motion to dismiss for lack of personal jurisdiction.

Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937. "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

"A court may consider a res judicata defense on a Rule 12(b)(6) motion to dismiss when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 498 (2d Cir. 2014) (citing *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992)). Generally, res judicata is an affirmative defense that is pleaded in the defendant's answer. *See Day v. Moscow*, 955 F.2d 807, 811 (2d Cir.1992) (citing Fed. R. Civ. P. 8(c)). However, "when all relevant facts are shown by the court's own records, of which the court takes notice, the defense may be upheld on a Rule 12(b)(6) motion without requiring an answer." *Id*. (citing *W.E. Hedger Transp. Corp. v. Ira S. Bushey & Sons*, 186 F.2d 236, 237 (2d Cir. 1951)). In considering a motion to dismiss, a court is permitted to take judicial notice of public records, which includes complaints and other documents filed in federal court. *See Harrison v. Diamonds*, No. 14-cv-484 (VEC), 2014 WL 3583046, at *2 (S.D.N.Y. July 18, 2014) (quoting *Yan Won Liao v. Holder*, 691 F. Supp. 2d 344, 351–52 (E.D.N.Y. 2010)) (internal quotation marks omitted). When a court takes judicial notice of such documents, it does so "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc*., 937 F.2d 767, 774 (2d Cir. 1991). Given that Defendants' motion is predicated on prior litigation in this District, the Court takes judicial notice of the documents filed in connection with the Prior Federal Action.

### III.    DISCUSSION

#### A.    Go New York's Claims Pursuant to the Sherman Act and its Unfair Competition Claim are Barred by Res Judicata

Defendants argue that Go New York's Sherman Act claims and common law unfair competition claim are barred by res judicata due to the dismissal of these claims with prejudice in the Prior Federal Action.  Doc. 67 at 19–24.  Go New York argues that res judicata does not bar its claims in this action because they are premised, in part, on agreements which postdate Judge Kaplan's final judgment.  Doc. 71 at 15–18.

Res judicata, also called claim preclusion, prevents parties from relitigating issues that were or could have been decided on the merits in a previous action.  *Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 157 (2d Cir. 2017).  To prove that res judicata bars a subsequent action, a party must show that the earlier decision was "(1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action."  *EDP Medical Computer Sys. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007).  If these elements are met, a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  *Id.*  "Dismissal with prejudice as a result of a successful motion to dismiss is usually considered a final adjudication on the merits."  *Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 322 (S.D.N.Y. 2015); *see also Mitchell v. Nat'l Broadcasting Co.*, 553 F.2d 265, 268 (2d Cir.1977) ("It is well settled that ... a motion to dismiss for failure to state a claim upon which relief can be granted and without reservation of any issue, is presumed to be upon the merits[.]").

Go New York does not dispute that the Prior Federal Action was a final adjudication on the merits by a court of competent jurisdiction and that it involved the same parties as in the instant action.  Accordingly, the only remaining issue is whether Go New York's claims in the instant litigation and the Prior Federal Action involve the same causes of action.

*1. New Factual Allegations*

In both the Prior Federal Action and in the instant action, Go New York alleges violations of §§ 1 and 2 of the Sherman Act and a common law unfair competition claim. However, Go New York argues that the causes of action pled here are different from those it raised in the prior suit because the "core" of its new allegations are premised on Defendants' entry into the 2020 MOU (and other unspecified "subsequent related operating agreements"). Doc. 71 at 16. According to Go New York, because the prior action predated the 2020 MOU, it could not have brought its monopolization and attempted monopolization theories before Judge Kaplan nor alleged "the existence of a formal agreement between Big Bus Line pursuant to which the parties agreed to share trade partners with each other while excluding Go New York from access to such trade partners." *Id.* at 16–17.

While Go New York could not make factual allegations about the MOU and alleged subsequent operating agreements in the Prior Federal Action, the relevant question is whether "the later conduct can support a cause of action on its own[.]" *TechnoMarine SA v. Giftports, Inc*., 758 F.3d 493, 503 (2d Cir. 2014). If so, it is "the basis of a new cause of action not precluded by the earlier judgment." *Id*. Stated differently, res judicata applies "where some of the facts on which a subsequent action is based post-date the first action but do not amount to a new claim." *Storey v. Cello Holdings*, L.L.C., 347 F.3d 370, 384 (2d Cir. 2003).

The Court finds *Waldman v. Village of Kiryas Joel* instructive on the issue of what constitutes new conduct that supports a subsequent cause of action. In that case, Waldman initially sued the Village of Kiryas Joel, New York, for discrimination and constitutional violations ("*Waldman I*"). *Waldman v. Village of Kiryas Joel*, No. 97-cv-74 (JSR) (S.D.N.Y. Apr. 9, 1997). As part of a settlement, the parties agreed to dismissal of the claims with prejudice. *Waldman v. Village of Kiryas Joel*, 207 F.3d 105, 107 (2d Cir. 2000). In a second filed-action ("*Waldman II*"), Waldman accused the Village of

13

"excessive entanglement with religion" and sought its dissolution under the

Establishment Clause.  207 F.3d 105, 107–108 (2d Cir. 2000).  The Second Circuit

determined that:

> it is simply not plausible to characterize Waldman's claim as one
> based in any significant way upon the post-*Waldman I* facts.  The
> new allegations made in the present complaint do not, either by
> themselves or to any degree not already demonstrated by the over-
> lapping facts, establish the sort of pervasive and otherwise irreme-
> diable entanglement between church and state that would justify a
> drastic remedy like the dissolution of the Village.... We conclude
> that, in seeking the dissolution of [the Village], Waldman has based
> his action principally upon the common nucleus of operative facts
> shared with *Waldman I*.

*Waldman II* at 113.  Therefore, the Second Circuit held that facts post-dating the first

action did "not create a 'new' cause of action that did not exist when the prior suits were

brought" and that Waldman's claim was barred by res judicata.  *Id*. at 112.  While the

Second Circuit left open the possibility that future actions could support a new cause of

action, it stated that Waldman could not use "the mere inclusion of a few post-*Waldman I*

Village acts ... to resurrect a claim[.]"  *Id*. at 114.

    Much like in *Waldman II,* Go New York's new factual allegations do not support

its causes of action.  First, the MOU does not plausibly support the antitrust claims.  To

summarize, Go New York alleges that the MOU resulted in the merger of Defendants'

companies and formalized Defendants' alleged conspiracy "to monopolize and fix prices

within the market for New York City Hop-on, Hop-off tour bus services, and to

effectively shut Go New York out of the Attraction Pass sub-market, making it difficult if

not impossible for Go New York to offer and sell competitive attraction passes."  ¶¶ 44,

61.  But the text of the MOU fails to support these allegations, as it only describes an

agreement for Gray Line to resell tickets for Big Bus tour bus services and to license

intellectual properly "solely" to the extent necessary for such resale.  *See* Doc. 53-1.  The

MOU does not purport to combine or merge Defendants' businesses into a "single entity,"

nor does it reflect an agreement between Defendants "to fix prices" and prevent

competition in the tour bus and multi-attraction pass industries in New York City.  Doc. 71 at 26.  Go New York's claim that the MOU "formalize[s] and extend[s] a pre-existing conspiracy among Big Bus, Gray Line and Go City to deny Go New York access to critical trade partners within New York City," *id.* at 11, is also implausible.  The MOU, by its own terms, expressly excludes third-party attractions from its scope.  *See* Doc. 53-1 at 2.

Second, Go New York's reference to "subsequent related operating agreements" fails to bolster its argument.  The allegations are wholly conclusory.  The First Amended Complaint does not allege the terms of these agreements, the parties to them, when they were entered into, or even their subject matter.  ¶ 56.  *See Iqbal*, 556 U.S. at 662 (citing *Twombly*, 550 U.S. at 544) (pleadings must allege facts that are plausible and not merely conclusory statements).[12]

Third, Go New York argues that its claims in this action are distinguishable from its previously dismissed claims because the complaint in the Prior Federal Action was "based almost exclusively" and "alleged primarily" that Big Bus and Gray Line were attempting to dominate the attraction pass market by shutting Go New York out of arrangements with third-party attractions.  Doc. 71 at 13, 19.  Meanwhile, here, the allegations here are based on a "formal agreement" to merge operations pursuant to the MOU.  Doc. 71 at 17–18.  The Court is unpersuaded.  In the Prior Federal Action, Go New York alleged that Gray Line and Big Bus each "possess[] monopoly power in the New York City hop on, hop off tour bus market,"  such that the companies have worked together to "improperly prevent[] or impede[] Go New York's ability to compete in *said* market by offering competitive Multi-Attraction Passes."  ¶¶ 80–83 (emphasis added).  Accordingly, the Prior Federal Action did allege antitrust claims on the basis of conduct

---

[12]  To the extent Go New York means the other agreements it describes in the First Amended Complaint, namely Gray Line and Big Bus' cross-licensing of trademarks, use of certain bus stops, and payments to sales representatives, these allegations are also not sufficient evidence of a merger.

in the New York tour bus market, as alleged in the instant case.  Judge Kaplan dismissed these claims with prejudice.  *See* Doc. 92 at 2–3.

Thus, the Court finds that the new conduct alleged in the instant action—specifically, the MOU and the unspecified subsequent operating agreements—do not support a new cause of action for the Sherman Act violations and the unfair competition claim.  *See TechnoMarine SA*, 758 F.3d 503, *Storey*, 347 F.3d 384.  Like in *Waldman II*, it is simply not "plausible" to characterize Go New York's antitrust claims as based, "in a significant way" on facts that occurred after the Prior Federal Action.  *Waldman*, 207 F.3d at 113.

### 2.  Other Factual Allegations

Turning to the remaining factual allegations, Go New York's claims are premised on the same facts it alleged in the Prior Federal Action:  an alleged conspiracy between Defendants to impede Go New York's ability to compete in the tour bus and multi-attraction pass markets in New York City by, among other things, persuading various tourist attractions and service operators not to do business with Go New York.  To support its claim, Go New York references the same nine tourist attractions as in the Prior Federal Actions, and in fact brings nearly verbatim allegations.  *Compare Go New York Tours, Inc.*, No. 19-cv-02832 (LAK), Doc. 84 (second amended complaint in Prior Federal Action) *with Go New York Tours, Inc.*, No. 23-cv-4256 (ER), Doc. 59 (First Amended Complaint in the instant action).

When analyzing the "same cause of action" requirement, courts in this Circuit consider whether the subsequent action concerns "the same claim—or nucleus of operative facts—as the first suit applying three considerations:  "(1) whether the underlying facts are related in time, space, origin, or motivation; (2) whether the underlying facts form a convenient trial unit; and (3) whether their treatment as a unit conforms to the parties' expectations."  *Channer v. Dep't of Homeland Security*, 527 F.3d 275, 280 (2d Cir. 2008) (internal quotation marks omitted).  "[T]he facts essential to the

16

## SPA17

barred second suit need not be the same as the facts that were necessary to the first suit. It is instead enough that the facts essential to the second were [already] present in the first." *Id.* (internal quotation marks and citations omitted).

The facts underlying the claims in this action are "related in time, space, origin, or motivation" to the nearly identical factual allegations in the Prior Federal Action. *See Channer*, 527 F.3d at 80. The claims in this action would have formed a convenient trial unit with the Prior Federal Action, as both involve substantially the same allegations. *Id.* Finally, the Court finds that treating the facts as a single unit would have conformed to the parties' expectations, as the legally relevant facts largely overlap. *Id.* The instant case therefore only presents "subtle differences" with the allegations in the Prior Federal Action, which are "not enough to overcome the many similarities, that, in their totality, render the respectively complaints sufficiently 'related in time, space, origin, or motivation' to trigger res judicata." *Beijing Neu Cloud Oriental Sys. Tech. Co. v. International Business Machines Corp.*, No. 22-3132, 2024 WL 3529080, at *8 (2d Cir. July 25, 2024) (citations omitted); *Id.* at *7 (applying res judicata when "[f]undamentally, both [cases] allege the same injury based on the same series of events" and the complaints "rely on nearly identical allegations[.]"). Thus, the Court finds that the instant case concerns the same nucleus of operative facts as the Prior Federal Action.

In sum, res judicata bars consideration of Go New York's Sherman Act claims as well as its unfair competition claim.

### B. Go New York's Remaining Claims are Dismissed Without Prejudice

Go New York's remaining federal claim challenges the alleged merger between Gray Line and Big Bus pursuant to the Clayton Act § 7.[13] ¶¶ 112–15. A merger violates § 7 if "in any line of commerce or in any activity affecting commerce in any section of

---

[13] Go New York also brings claims for violations of § 4 of the Clayton Act, but this provision relates to the availability of treble damages for antitrust violations and is "designed primarily as a remedy." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977). Neither party expressly references § 4 in their arguments. *See* Docs 67, 71, 76. Accordingly, the Court does not engage in a separate analysis of § 4.

the country, the effect of such [merger] may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Section 7 prohibits certain mergers between competitors in a market, *United States v. Continental Can Co.*, 378 U.S. 441 (1964), certain acquisitions of a market competitor by a noncompetitor, *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 578–580 (1967), and certain mergers that eliminate a potential competitor, *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 173–174 (1964).

　　　None of the proceeding situations apply here. As evidence of the alleged merger, Go New York only relies on the MOU, cross licenses of trademarks, and the fact Gray Line allegedly allows Big Bus to use its bus stops. ¶¶ 55–58. For the reasons described above, the MOU does not plausibly allege a merger between Gray Line and Big Bus. And any agreements to cross license trademarks or to use certain bus stops do not show that the Defendants have entered into a merger or acquisition agreement.[14] Accordingly, the Court finds that Go New York's allegations of a merger are unsupported by the factual allegations, and therefore dismisses its Clayton Act claim without prejudice.[15]

　　　Finally, Go New York asserts that Defendants violated the Donnelly Act, New York's antitrust statute. ¶¶ 116–121. Federal district courts have supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III

---

[14] Although not expressly alleged in the Clayton Act claim, the Court also finds that Go New York's claim that Gray Line and Big Bus "must" allocate revenue and commissions also does not support the argument that they have merged. ¶ 60. Go New York does not allege the existence of a formal agreement to provide such revenue allocations, and even if it did, the agreement does not purport to create a merger.

[15] Defendants request that the First Amended Complaint be dismissed with prejudice. Doc. 76 at 6. The Second Circuit has counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims. *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015). To be clear, while Go New York did bring a Clayton Act § 4 claim in the Prior Federal Action seeking treble damages, it did not bring a Clayton Act § 7 claim. Accordingly, this is the Court's first opportunity to highlight the precise defects of the Clayton Act § 7 claim. The Court will therefore not dismiss the claim with prejudice.

of the United States Constitution."  28 U.S.C. § 1367(a).  The doctrine of supplemental jurisdiction is traditionally "a doctrine of discretion, not of plaintiff's right."  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).  Subsection (c) of § 1367 enumerates circumstances in which a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a)."  28 U.S.C. § 1367(c).  One such circumstance is where, as here, "the district court has dismissed all claims over which it has original jurisdiction."  *Id.*

Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional "values of judicial economy, convenience, fairness, and comity" in deciding whether to exercise jurisdiction.  *Kolari*, 455 F.3d at 122 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  The Supreme Court has noted that in a case where all federal claims are eliminated before trial, "the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Id.* (internal quotation marks omitted); *see also Gibbs*, 383 U.S. at 726 ("[I]f the federal law claims are dismissed before trial ... the state claims should be dismissed as well.").  As Go New York's federal claims have been dismissed, the Court declines to exercise jurisdiction over the Donnelly Act claim, which is dismissed without prejudice.

## IV.    CONCLUSION

The Court GRANTS Defendants' motion to dismiss the complaint.  Accordingly, the Foreign Defendants' motion is DENIED as moot.  As noted above, the Court declines to exercise jurisdiction over the remaining state law claim.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 64 and 66, and to close the case.

SO ORDERED.

Dated:    August 27, 2024
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.

# 15 U.S.C. § 1

Section 1 - Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

*15 U.S.C. § 1*

July 2, 1890, ch. 647, §1, 26 Stat. 209; Aug. 17, 1937, ch. 690, title VIII, 50 Stat. 693; July 7, 1955, ch. 281, 69 Stat. 282; Pub. L. 93-528, §3, Dec. 21, 1974, 88 Stat. 1708; Pub. L. 94-145, §2, Dec. 12, 1975, 89 Stat. 801; Pub. L. 101-588, §4(a), Nov. 16, 1990, 104 Stat. 2880; Pub. L. 108-237, title II, §215(a), June 22, 2004, 118 Stat. 668.

### EDITORIAL NOTES

**AMENDMENTS2004-** *Pub. L. 108-237 substituted "$100,000,000" for "$10,000,000", "$1,000,000" for "$350,000", and "10" for "three".* **1990-** *Pub. L. 101-588 substituted "$10,000,000" for "one million dollars" and "$350,000" for "one hundred thousand dollars".* **1975-** *Pub. L. 94-145 struck out from first sentence two provisos granting anti-trust exemption to State fair trade laws.* **1974-** *Pub. L. 93-528 substituted "a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years" for "a misdemeanor, and on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year".* **1955-** *Act July 7, 1955, substituted "fifty thousand dollars" for "five thousand dollars".* **1937-** *Act Aug. 17, 1937, inserted two provisos.*

### STATUTORY NOTES AND RELATED SUBSIDIARIES

**EFFECTIVE DATE OF 2001 AMENDMENT** *Pub. L. 107-72, §4, Nov. 20, 2001, 115 Stat. 650, provided that: "This Act [enacting and amending provisions set out as notes under this section] and the amendments made by this Act shall take effect on September 30, 2001."*

**EFFECTIVE DATE OF 1975 AMENDMENT** *Pub. L. 94-145, §4, Dec. 12, 1974, 89 Stat. 801, provided that: "The amendments made by sections 2 and 3 of this Act [amending this section and section 45 of this title] shall take effect upon the expiration of the ninety-day period which begins on the date of enactment of this Act [Dec. 12, 1975]."*

**SHORT TITLE OF 2022 AMENDMENT** *Pub. L. 117-328 div. GG, §101, Dec. 29, 2022, 136 Stat. 5967, provided that: "This division [enacting section 18b of this title, amending section 1407 of Title 28, Judiciary and Judicial Procedure, enacting provisions set out as a note under section 18b of this title, and amending provisions set out as a note under section 18a of this title] may be cited as the 'Merger Filing Fee Modernization Act of 2022'."[Another section 101 of div. GG of Pub. L. 117-328 amended provisions set out as a note under section 18a of this title.]*



# SPA21

Section 1 ...     15 U.S.C. § 1

*SHORT TITLE OF 2020 AMENDMENT Pub. L. 116-257, §1, Dec. 23, 2020, 134 Stat. 1147, provided that: "This Act [enacting section 7a-3 of this title] may be cited as the 'Criminal Antitrust Anti-Retaliation Act of 2019'." Pub. L. 116-159, div. D, title III, §43014301,, 134 Stat. 742, provided that: "This title [enacting provisions set out as notes under section 7a of this title and amending and repealing provisions set out as notes under this section] may be cited as the 'Antitrust Criminal Penalty Enhancement and Reform Permanent Extension Act'."*

*SHORT TITLE OF 2015 AMENDMENT Pub. L. 114-44, §1, Aug. 6, 2015, 129 Stat. 472, provided that: "This Act [amending provisions set out as a note under this section] may be cited as the 'Need-Based Educational Aid Act of 2015'."*

*SHORT TITLE OF 2009 AMENDMENT Pub. L. 111-30, §1, June 19, 2009, 123 Stat. 1775, provided that: "This Act [enacting and amending provisions set out as notes under this section] may be cited as the 'Antitrust Criminal Penalty Enhancement and Reform Act of 2004 Extension Act'."*

*SHORT TITLE OF 2008 AMENDMENT Pub. L. 110-327, §1, Sept. 30, 2008, 122 Stat. 3566, provided that: "This Act [amending provisions set out as a note under this section] may be cited as the 'Need-Based Educational Aid Act of 2008'."*

*SHORT TITLE OF 2007 AMENDMENT Pub. L. 110-6, §1, Feb. 26, 2007, 121 Stat. 61, provided that: "This Act [amending provisions set out as a note under this section] may be cited as the 'Antitrust Modernization Commission Extension Act of 2007'."*

*SHORT TITLE OF 2004 AMENDMENT Pub. L. 108-237, title II, §201, June 22, 2004, 118 Stat. 665, provided that: "This title [amending this section and sections 2, 3, and 16 of this title and enacting provisions set out as notes under this section and section 16 of this title] may be cited as the 'Antitrust Criminal Penalty Enhancement and Reform Act of 2004'."*

*SHORT TITLE OF 2002 AMENDMENT Pub. L. 107-273, div. C, title IV, §141014101,, 116 Stat. 1921, provided that: "This title [amending sections 3, 12, 27, and 44 of this title, section 225 of Title 7, Agriculture, section 1413 of Title 30, Mineral Lands and Mining, and section 2135 of Title 42, The Public Health and Welfare, repealing sections 30 and 31 of this title, enacting provisions set out as a note under section 3 of this title, amending provisions set out as notes under section 8 of this title, and repealing provisions set out as notes under section 15 of this title and section 41309 of Title 49, Transportation] may be cited as the 'Antitrust Technical Corrections Act of 2002'."*

*SHORT TITLE OF 2001 AMENDMENT Pub. L. 107-72, §1, Nov. 20, 2001, 115 Stat. 648, provided that: "This Act [enacting and amending provisions set out as notes under this section] may be cited as the 'Need-Based Educational Aid Act of 2001'."*

*SHORT TITLE OF 1998 AMENDMENT Pub. L. 105-297, §1, Oct. 27, 1998, 112 Stat. 2824, provided that: "This Act [enacting section 26b of this title and provisions set out as a note under section 26b of this title] may be cited as the 'Curt Flood Act of 1998'."*

*SHORT TITLE OF 1997 AMENDMENTS Pub. L. 105-43, §1, Sept. 17, 1997, 111 Stat. 1140, provided that: "This Act [enacting and amending provisions set out as notes below] may be cited as the 'Need-Based Educational Aid Antitrust Protection Act of 1997'." Pub. L. 105-26, §1, July 3, 1997, 111 Stat. 241, provided that: "This Act [amending sections 37 and 37a of this title and enacting provisions set out as notes under section 37 of this title] may be cited as the 'Charitable Donation Antitrust Immunity Act of 1997'."*



# SPA22

Section 1 ...     15 U.S.C. § 1

*SHORT TITLE OF 1995 AMENDMENT Pub. L. 104-63, §1, Dec. 8, 1995, 109 Stat. 687, provided that: "This Act [enacting sections 37 and 37a of this title and provisions set out as a note under section 37 of this title] may be cited as the 'Charitable Gift Annuity Antitrust Relief Act of 1995'."*

*SHORT TITLE OF 1990 AMENDMENT Pub. L. 101-588, §1, Nov. 16, 1990, 104 Stat. 2879, provided: "That this Act [amending this section and sections 2, 3, 15a, and 19 of this title and repealing section 20 of this title] may be cited as the 'Antitrust Amendments Act of 1990'."*

*SHORT TITLE OF 1984 AMENDMENTPub. L. 98-544, §1, Oct. 24, 1984, 98 Stat. 2750, provided: "That this Act [enacting sections 34 to 36 of this title and provisions set out as a note under section 34 of this title] may be cited as the 'Local Government Antitrust Act of 1984'."*

*SHORT TITLE OF 1982 AMENDMENT Pub. L. 97-290, title IV, §401, Oct. 8, 1982, 96 Stat. 1246, provided that: "This title [enacting section 6a of this title and amending section 45 of this title] may be cited as the 'Foreign Trade Antitrust Improvements Act of 1982'."*

*SHORT TITLE OF 1980 AMENDMENT Pub. L. 96-493, §1, Dec. 2, 1980, 94 Stat. 2568, provided: "That this Act [enacting section 26a of this title] may be cited as the 'Gasohol Competition Act of 1980'."*

*SHORT TITLE OF 1976 AMENDMENTPub. L. 94-435, §1, Sept. 30, 1976, 90 Stat. 1383, provided: "That this Act [enacting sections 15c to 15h, 18a, and 66 of this title, amending sections 12, 15b, 16, 26, and 1311 to 1314 of this title, section 1505 of Title 18, Crimes and Criminal Procedure, and section 1407 of Title 28, Judiciary and Judicial Procedure, and enacting provisions set out as notes under sections 8, 15c, 18a, and 1311 of this title] may be cited as the 'Hart-Scott-Rodino Antitrust Improvements Act of 1976'."*

*SHORT TITLE OF 1975 AMENDMENT Pub. L. 94-145, §1, Dec. 12, 1975, 89 Stat. 801, provided: "That this Act [amending this section and section 45 of this title and enacting provisions set out as a note under this section] may be cited as the 'Consumer Goods Pricing Act of 1975'."*

*SHORT TITLE OF 1974 AMENDMENTPub. L. 93-528, §1, Dec. 21, 1974, 88 Stat. 1706, provided: "That this Act [amending this section and section 2, 3, 16, 28, and 29 of this title, section 401 of Title 47, Telecommunications, and sections 43, 44, and 45 of former Title 49, Transportation, and enacting provisions set out as notes under this section and section 29 of this title] may be cited as the 'Antitrust Procedures and Penalties Act'."*

*SHORT TITLEPub. L. 94-435, title III, §305(a), Sept. 30, 1976, 90 Stat. 1397, added immediately following the enacting clause of act July 2, 1890, the following: "That this Act [this section and sections 2 to 7 of this title] may be cited as the 'Sherman Act'."*

*ANTITRUST ENFORCEMENT ENHANCEMENTS AND COOPERATION INCENTIVES Pub. L. 108-237, title II, §211, June 22, 2004, 118 Stat. 666, as amended by Pub. L. 111-30, §2, June 19, 2009, 123 Stat. 1775; Pub. L. 111-190, §1, June 9, 2010, 124 Stat. 1275, which provided a sunset date for sections 211 to 214 of Pub. L. 108-237 with exceptions, was repealed by Pub. L. 116-159, div. D, title III, §4303(a), Oct. 1, 2020, 134 Stat. 742, with continuity provision for markers and agreements existing on or before June 22, 2020. Pub. L. 108-237, title II, §212, June 22, 2004, 118 Stat. 666, as amended by Pub. L. 111-190, §2, June 9, 2010, 124 Stat. 1275; Pub. L. 116-159, div. D, title III, §4303(b)(2), Oct. 1, 2020, 134 Stat. 742, which defined terms for sections 211 to 215 of Pub. L. 108-237 was transferred to section 7a of this title. Pub. L. 108-237, title II, §213, June 22, 2004, 118 Stat. 666, as amended by Pub. L. 111-190, §3, June 9, 2010, 124 Stat. 1275, which provided limitation on recovery, was*



*transferred to section 7a-1 of this title. Pub. L. 108-237, title II, §214, June 22, 2004, 118 Stat. 667, as amended by Pub. L. 111-190, §4, June 9, 2010, 124 Stat. 1276, which provided rights, authorities, and liabilities not affected by sections 211 to 215 of Pub. L. 108-237 was transferred to section 7a-2 of this title.*

***ANTITRUST MODERNIZATION COMMISSION*** *Pub. L. 107-273, 116 Stat. 1856, as amended by Pub. L. 110-6, §2, Feb. 26, 2007, 121 Stat. 61, provided that:*

*"SEC. 11051. SHORT TITLE."This subtitle may be cited as the 'Antitrust Modernization Commission Act of 2002'.*

*"SEC. 11052. ESTABLISHMENT."There is established the Antitrust Modernization Commission (in this subtitle referred to as the 'Commission').*

*"SEC. 11053. DUTIES OF THE COMMISSION."The duties of the Commission are-"(1) to examine whether the need exists to modernize the antitrust laws and to identify and study related issues;"(2) to solicit views of all parties concerned with the operation of the antitrust laws; "(3) to evaluate the advisability of proposals and current arrangements with respect to any issues so identified; and "(4) to prepare and to submit to Congress and the President a report in accordance with section 11058.*

*"SEC. 11054. MEMBERSHIP."(a) NUMBER AND APPOINTMENT.-The Commission shall be composed of 12 members appointed as follows:"(1) Four members, no more than 2 of whom shall be of the same political party, shall be appointed by the President. The President shall appoint members of the opposing party only on the recommendation of the leaders of Congress from that party."(2) Two members shall be appointed by the majority leader of the Senate."(3) Two members shall be appointed by the minority leader of the Senate. "(4) Two members shall be appointed by the Speaker of the House of Representatives. "(5) Two members shall be appointed by the minority leader of the House of Representatives."(b) INELIGIBILITY FOR APPOINTMENT.-Members of Congress shall be ineligible for appointment to the Commission."(c) TERM OF APPOINTMENT.-"(1) IN GENERAL.-Subject to paragraph (2), members of the Commission shall be appointed for the life of the Commission."(2) EARLY TERMINATION OF APPOINTMENT.-If a member of the Commission who is appointed to the Commission as- "(A) an officer or employee of a government ceases to be an officer or employee of such government; or "(B) an individual who is not an officer or employee of a government becomes an officer or employee of a government;then such member shall cease to be a member of the Commission on the expiration of the 90-day period beginning on the date such member ceases to be such officer or employee of such government, or becomes an officer or employee of a government, as the case may be. "(d) QUORUM.-Seven members of the Commission shall constitute a quorum, but a lesser number may conduct meetings."(e) APPOINTMENT DEADLINE.-Initial appointments under subsection (a) shall be made not later than 60 days after the date of enactment of this Act [Nov. 2, 2002]."(f) MEETINGS.-The Commission shall meet at the call of the chairperson. The first meeting of the Commission shall be held not later than 30 days after the date on which all members of the Commission are first appointed under subsection (a) or funds are appropriated to carry out this subtitle, whichever occurs later. "(g) VACANCY.-A vacancy on the Commission shall be filled in the same manner as the initial appointment is made."(h) CONSULTATION BEFORE APPOINTMENT.-Before appointing members of the Commission, the President, the majority and minority leaders of the Senate, the Speaker of the House of Representatives, and the minority leader of the House of Representatives shall consult with each other to ensure fair and equitable representation of various points of view in the Commission."(i) CHAIRPERSON; VICE CHAIRPERSON.-The President shall select the chairperson of the Commission from among its appointed members. The leaders of Congress from the opposing party of the President shall select the vice chairperson of the Commission from among its remaining members.*



"SEC. 11055. COMPENSATION OF THE COMMISSION."(a) PAY.-"(1) NONGOVERNMENT EMPLOYEES.-Each member of the Commission who is not otherwise employed by a government shall be entitled to receive the daily equivalent of the annual rate of basic pay payable for level IV of the Executive Schedule under section 5315 of title 5 United States Code, as in effect from time to time, for each day (including travel time) during which such member is engaged in the actual performance of duties of the Commission."(2) GOVERNMENT EMPLOYEES.-A member of the Commission who is an officer or employee of a government shall serve without additional pay (or benefits in the nature of compensation) for service as a member of the Commission."(b) TRAVEL EXPENSES.-Members of the Commission shall receive travel expenses, including per diem in lieu of subsistence, in accordance with subchapter I of chapter 57 of title 5, United States Code.

"SEC. 11056. STAFF OF COMMISSION; EXPERTS AND CONSULTANTS. "(a) STAFF.- "(1) APPOINTMENT.-The chairperson of the Commission may, without regard to the provisions of chapter 51 of title 5 of the United States Code (relating to appointments in the competitive service), appoint and terminate an executive director and such other staff as are necessary to enable the Commission to perform its duties. The appointment of an executive director shall be subject to approval by the Commission."(2) COMPENSATION.-The chairperson of the Commission may fix the compensation of the executive director and other staff without regard to the provisions of chapter 51 and subchapter III of chapter 53 of title 5 of the United States Code (relating to classification of positions and General Schedule pay rates), except that the rate of pay for the executive director and other staff may not exceed the rate of basic pay payable for level V of the Executive Schedule under section 5315 of title 5 United States Code, as in effect from time to time."(b) EXPERTS AND CONSULTANTS.-The Commission may procure temporary and intermittent services of experts and consultants in accordance with section 3109(b) of title 5, United States Code.

"SEC. 11057. POWERS OF THE COMMISSION."(a) HEARINGS AND MEETINGS.-The Commission, or a member of the Commission if authorized by the Commission, may hold such hearings, sit and act at such time and places, take such testimony, and receive such evidence, as the Commission considers to be appropriate. The Commission or a member of the Commission may administer oaths or affirmations to witnesses appearing before the Commission or such member."(b) OFFICIAL DATA.-The Commission may obtain directly from any executive agency (as defined in section 105 of title 5 of the United States Code) or court information necessary to enable it to carry out its duties under this subtitle. On the request of the chairperson of the Commission, and consistent with any other law, the head of an executive agency or of a Federal court shall provide such information to the Commission."(c) FACILITIES AND SUPPORT SERVICES.-The Administrator of General Services shall provide to the Commission on a reimbursable basis such facilities and support services as the Commission may request. On request of the Commission, the head of an executive agency may make any of the facilities or services of such agency available to the Commission, on a reimbursable or nonreimbursable basis, to assist the Commission in carrying out its duties under this subtitle."(d) EXPENDITURES AND CONTRACTS.-The Commission or, on authorization of the Commission, a member of the Commission may make expenditures and enter into contracts for the procurement of such supplies, services, and property as the Commission or such member considers to be appropriate for the purpose of carrying out the duties of the Commission. Such expenditures and contracts may be made only to such extent or in such amounts as are provided in advance in appropriation Acts."(e) MAILS.-The Commission may use the United States mails in the same manner and under the same conditions as other departments and agencies of the United States."(f) GIFTS, BEQUESTS, AND DEVISES.-The Commission may accept, use, and dispose of gifts, bequests, or devises of services or property, both real and personal, for the purpose of aiding or facilitating the work of the Commission. Gifts, bequests, or devises of money and proceeds from sales of other property received as gifts, bequests, or devises shall be deposited in the Treasury and shall be available for disbursement upon order of the Commission.



# SPA25

Section 1 ...    15 U.S.C. § 1

"SEC. 11058. REPORT."Not later than 3 years after the first meeting of the Commission, the Commission shall submit to Congress and the President a report containing a detailed statement of the findings and conclusions of the Commission, together with recommendations for legislative or administrative action the Commission considers to be appropriate.

"SEC. 11059. TERMINATION OF COMMISSION. "The Commission shall cease to exist 60 days after the date on which the report required by section 11058 is submitted.

"SEC. 11060. AUTHORIZATION OF APPROPRIATIONS."There is authorized to be appropriated $4,000,000 to carry out this subtitle."

**YEAR 2000 INFORMATION AND READINESS DISCLOSURE** Pub. L. 105-271, 112 Stat. 2386, as amended by Pub. L. 107-273, div. C, title IV, §14102(e), Nov. 2, 2002, 116 Stat. 1922, known as the Year 2000 Information and Readiness disclosure Act, provided for the free disclosure and exchange of information about computer processing problems, solutions, test practices and test results, and related matters in connection with the transition to the year 2000.

**APPLICATION OF ANTITRUST LAWS TO AWARD OF NEED-BASED EDUCATIONAL AID** Pub. L. 107-72, §3, Nov. 20, 2001, 115 Stat. 648, provided that:"(a) STUDY.- "(1) IN GENERAL.-The Comptroller General shall conduct a study of the effect of the antitrust exemption on institutional student aid under section 568 of the Improving America's Schools Act of 1994 (1 5 U.S.C. 1 note) [Pub. L. 103-382 see below]."(2) CONSULTATION.-The Comptroller General shall have final authority to determine the content of the study under paragraph (1), but in determining the content of the study, the Comptroller General shall consult with-"(A) the institutions of higher education participating under the antitrust exemption under section 568 of the Improving America's Schools Act of 1994 (1 5 U.S.C. 1 note) (referred to in this Act [see Short Title of 2001 Amendment note above] as the 'participating institutions');"(B) the Antitrust Division of the Department of Justice; and"(C) other persons that the Comptroller General determines are appropriate."(3) MATTERS STUDIED.-"(A) IN GENERAL.-The study under paragraph (1) shall-"(i) examine the needs analysis methodologies used by participating institutions; "(ii) identify trends in undergraduate costs of attendance and institutional undergraduate grant aid among participating institutions, including- "(I) the percentage of first-year students receiving institutional grant aid; "(II) the mean and median grant eligibility and institutional grant aid to first-year students; and"(III) the mean and median parental and student contributions to undergraduate costs of attendance for first year students receiving institutional grant aid; "(iii) to the extent useful in determining the effect of the antitrust exemption under section 568 of the Improving America's Schools Act of 1994 (15 U.S.C. 1 note), examine- "(I) comparison data, identified in clauses (i) and (ii), from institutions of higher education that do not participate under the antitrust exemption under section 568 of the Improving America's Schools Act of 1994 (1 5 U.S.C. 1 note); and " (II) other baseline trend data from national benchmarks; and"(iv) examine any other issues that the Comptroller General determines are appropriate, including other types of aid affected by section 568 of the Improving America's Schools Act of 1994 (1 5 U.S.C. 1 note)."(B) ASSESSMENT.- "(i) IN GENERAL.-The study under paragraph (1) shall assess what effect the antitrust exemption on institutional student aid has had on institutional undergraduate grant aid and parental contribution to undergraduate costs of attendance."(ii) CHANGES OVER TIME.-The assessment under clause (i) shall consider any changes in institutional undergraduate grant aid and parental contribution to undergraduate costs of attendance over time for institutions of higher education, including consideration of- "(I) the time period prior to adoption of the consensus methodologies at participating institutions; and"(II) the data examined pursuant to subparagraph (A)(iii)."(b) REPORT.-"(1) IN GENERAL.-Not later than September 30, 2006, the Comptroller General shall submit a report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives that contains the findings and



## SPA26

*conclusions of the Comptroller General regarding the matters studied under subsection (a). "(2) IDENTIFYING INDIVIDUAL INSTITUTIONS.-The Comptroller General shall not identify an individual institution of higher education in information submitted in the report under paragraph (1) unless the information on the institution is available to the public."(c) RECORDKEEPING REQUIREMENT.- "(1) IN GENERAL.-For the purpose of completing the study under subsection (a)(!), a participating institution shall- "(A) collect and maintain for each academic year until the study under subsection (a)(1) is completed-"(i) student-level data that is sufficient, in the judgment of the Comptroller General, to permit the analysis of expected family contributions, identified need, and undergraduate grant aid awards; and"(ii) information on formulas used by the institution to determine need; and" (B) submit the data and information under paragraph (1) to the Comptroller General at such time as the Comptroller General may reasonably require."(2) NON-PARTICIPATING INSTITUTIONS.-Nothing in this subsection shall be construed to require an institution of higher education that does not participate under the antitrust exemption under section 568 of the Improving America's Schools Act of 1994 (1 5 U.S.C. 1 note) to collect and maintain data under this subsection." Pub. L. 103-382, title V, §568(a)-(d), Oct. 20, 1994, 108 Stat. 4060, 4061, as amended by Pub. L. 105-43, §2(a), Sept. 17, 1997, 111 Stat. 1140; Pub. L. 105-244, title I, §102(a)(3), Oct. 7, 1998, 112 Stat. 1618; Pub. L. 107-72, §2, Nov. 20, 2001, 115 Stat. 648; Pub. L. 110-327, §2, Sept. 30, 2008, 122 Stat. 3566; Pub. L. 114-44, §2, Aug. 6, 2015, 129 Stat. 472, provided that:"(a) EXEMPTION.-It shall not be unlawful under the antitrust laws for 2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis, to agree or attempt to agree-"(1) to award such students financial aid only on the basis of demonstrated financial need for such aid; "(2) to use common principles of analysis for determining the need of such students for financial aid if the agreement to use such principles does not restrict financial aid officers at such institutions in their exercising independent professional judgment with respect to individual applicants for such financial aid; or"(3) to use a common aid application form for need-based financial aid for such students if the agreement to use such form does not restrict such institutions in their requesting from such students, or in their using, data in addition to the data requested on such form. "(b) LIMITATIONS.-Subsection (a) shall not apply with respect to-"(1) any financial aid or assistance authorized by the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.); or "(2) any contract, combination, or conspiracy with respect to the amount or terms of any prospective financial aid award to a specific individual."(c) DEFINITIONS.-For purposes of this section-"(1) the term 'alien' has the meaning given such term in section 101(3) [101(a)(3)] of the Immigration and Nationality Act (8 U.S.C. 1101(3) [1101(a)(3)]);"(2) the term 'antitrust laws' has the meaning given such term in subsection (a) of the first section of the Clayton Act (1 5 U.S.C. 12(a)), except that such term includes section 5 of the Federal Trade Commission Act (1 5 U.S.C. 45 ) to the extent such section applies to unfair methods of competition; "(3) the term 'institution of higher education' has the meaning given such term in section 101 of the Higher Education Act of 1965 [20 U.S.C. 1001] ;"(4) the term 'lawfully admitted for permanent residence' has the meaning given such term in section 101(20) [101(a)(20)] of the Immigration and Nationality Act (8 U.S.C. 1101(20) [1101(a)(20)]);"(5) the term 'national of the United States' has the meaning given such term in section 101(22) [101(a)(22)] of the Immigration and Nationality Act (8 U.S.C. 1101(22) [1101(a)(22)]);"(6) the term 'on a need-blind basis' means without regard to the financial circumstances of the student involved or the student's family; and"(7) the term 'student' means, with respect to an institution of higher education, a national of the United States or an alien admitted for permanent residence who is admitted to attend an undergraduate program at such institution on a full-time basis. "(d) EXPIRATION.- Subsection (a) shall expire on September 30, 2022."[Pub. L. 105-43, §2(b), Sept. 17, 1997, 111 Stat. 1140, provided that: "The amendments made by subsection (a) [amending section 568(a)-(d) of Pub. L. 103-382 set out above] shall take effect immediately before September 30, 1997."]*

**EXECUTIVE DOCUMENTS**



# SPA27

Section 1 ...     15 U.S.C. § 1

*EX. ORD. NO. 14036. PROMOTING COMPETITION IN THE AMERICAN ECONOMY*Ex. Ord. No. 14036, *July 9, 2021, 86 F.R. 36987, provided:By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to promote the interests of American workers, businesses, and consumers, it is hereby ordered as follows:SECTION 1. Policy. A fair, open, and competitive marketplace has long been a cornerstone of the American economy, while excessive market concentration threatens basic economic liberties, democratic accountability, and the welfare of workers, farmers, small businesses, startups, and consumers.The American promise of a broad and sustained prosperity depends on an open and competitive economy. For workers, a competitive marketplace creates more high-quality jobs and the economic freedom to switch jobs or negotiate a higher wage. For small businesses and farmers, it creates more choices among suppliers and major buyers, leading to take-home income, which they can reinvest in their enterprises. For entrepreneurs, it provides space to experiment, innovate, and pursue the new ideas that have for centuries powered the American economy and improved our quality of life. And for consumers, it means more choices, better service, and lower prices.Robust competition is critical to preserving America's role as the world's leading economy.Yet over the last several decades, as industries have consolidated, competition has weakened in too many markets, denying Americans the benefits of an open economy and widening racial, income, and wealth inequality. Federal Government inaction has contributed to these problems, with workers, farmers, small businesses, and consumers paying the price.Consolidation has increased the power of corporate employers, making it harder for workers to bargain for higher wages and better work conditions. Powerful companies require workers to sign non-compete agreements that restrict their ability to change jobs. And, while many occupational licenses are critical to increasing wages for workers and especially workers of color, some overly restrictive occupational licensing requirements can impede workers' ability to find jobs and to move between States.Consolidation in the agricultural industry is making it too hard for small family farms to survive. Farmers are squeezed between concentrated market power in the agricultural input industries-seed, fertilizer, feed, and equipment suppliers-and concentrated market power in the channels for selling agricultural products. As a result, farmers' share of the value of their agricultural products has decreased, and poultry farmers, hog farmers, cattle ranchers, and other agricultural workers struggle to retain autonomy and to make sustainable returns.The American information technology sector has long been an engine of innovation and growth, but today a small number of dominant internet platforms use their power to exclude market entrants, to extract monopoly profits, and to gather intimate personal information that they can exploit for their own advantage. Too many small businesses across the economy depend on those platforms and a few online marketplaces for their survival. And too many local newspapers have shuttered or downsized, in part due to the internet platforms' dominance in advertising markets.Americans are paying too much for prescription drugs and healthcare services-far more than the prices paid in other countries. Hospital consolidation has left many areas, particularly rural communities, with inadequate or more expensive healthcare options. And too often, patent and other laws have been misused to inhibit or delay-for years and even decades-competition from generic drugs and biosimilars, denying Americans access to lower-cost drugs.In the telecommunications sector, Americans likewise pay too much for broadband, cable television, and other communications services, in part because of a lack of adequate competition. In the financial-services sector, consumers pay steep and often hidden fees because of industry consolidation. Similarly, the global container shipping industry has consolidated into a small number of dominant foreign-owned lines and alliances, which can disadvantage American exporters.The problem of economic consolidation now spans these sectors and many others, endangering our ability to rebuild and emerge from the coronavirus disease 2019 (COVID-19) pandemic with a vibrant, innovative, and growing economy. Meanwhile, the United States faces new challenges to its economic standing in the world, including unfair competitive pressures from foreign monopolies and firms that are state-owned or state-sponsored, or whose market power is directly supported by foreign governments.We must act now to reverse these dangerous trends, which constrain the growth and dynamism of*



# SPA28

Section 1 ...    15 U.S.C. § 1

our economy, impair the creation of high-quality jobs, and threaten America's economic standing in the world.This order affirms that it is the policy of my *Administration* to enforce the antitrust laws to combat the excessive concentration of industry, the abuses of market power, and the harmful effects of monopoly and monopsony-especially as these issues arise in labor markets, agricultural markets, Internet platform industries, healthcare markets (including insurance, hospital, and prescription drug markets), repair markets, and United States markets directly affected by foreign cartel activity.It is also the policy of my *Administration* to enforce the antitrust laws to meet the challenges posed by new industries and technologies, including the rise of the dominant Internet platforms, especially as they stem from serial mergers, the acquisition of nascent competitors, the aggregation of data, unfair competition in attention markets, the surveillance of users, and the presence of network effects.Whereas decades of industry consolidation have often led to excessive market concentration, this order reaffirms that the United States retains the authority to challenge transactions whose previous consummation was in violation of the Sherman Antitrust Act (26 Stat. 209, 1 5 U.S.C. 1 et seq.) (Sherman Act), the Clayton Antitrust Act (Public Law 63-212 38 Stat. 730, 15 U.S.C. 12 et seq.) (Clayton Act), or other laws. See 1 5 U.S.C. 18 ; Standard Oil Co. v. United States, 221 U.S. 1 (1911). This order reasserts as United States policy that the answer to the rising power of foreign monopolies and cartels is not the tolerance of domestic monopolization, but rather the promotion of competition and innovation by firms small and large, at home and worldwide.It is also the policy of my *Administration* to support aggressive legislative reforms that would lower prescription drug prices, including by allowing Medicare to negotiate drug prices, by imposing inflation caps, and through other related reforms. It is further the policy of my *Administration* to support the enactment of a public health insurance option.My *Administration* further reaffirms the policy stated in Executive Order 13725 of April 15, 2016 (Steps to Increase Competition and Better Inform Consumers and Workers to Support Continued Growth of the American Economy) [5 U.S.C. 601 note], and the Federal Government's commitment to the principles that led to the passage of the Sherman Act, the Clayton Act, the Packers and Stockyards Act, 1921 (Public Law 67-51 42 Stat. 159, 7 U.S.C. 181 et seq.) (Packers and Stockyards Act), the Celler-Kefauver Antimerger Act (Public Law 81-899 64 Stat. 1125), the Bank Merger Act (Public Law 86-463 74 Stat. 129, 12 U.S.C. 1828), and the Telecommunications Act of 1996 (Public Law 104-104 110 Stat. 56), among others. SEC. 2. The Statutory Basis of a Whole-of-Government Competition Policy. (a) The antitrust laws, including the Sherman Act, the Clayton Act, and the Federal Trade Commission Act (Public Law 63-203 38 Stat. 717, 1 5 U.S.C. 41 et seq.), are a first line of defense against the monopolization of the American economy.(b) The antitrust laws reflect an underlying policy favoring competition that transcends those particular enactments. As the Supreme Court has stated, for instance, the Sherman Act "rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 4 (1958).(c) Consistent with these broader policies, and in addition to the traditional antitrust laws, the Congress has also enacted industry-specific fair competition and anti-monopolization laws that often provide additional protections. Such enactments include the Packers and Stockyards Act, the Federal Alcohol *Administration* Act (Public Law 74-401 49 Stat. 977, 2 7 U.S.C. 201 et seq.), the Bank Merger Act, the Drug Price Competition and Patent Term Restoration Act of 1984 (Public Law 98-417 98 Stat. 1585), the Shipping Act of 1984 (Public Law 98-237 98 Stat. 67, 46 U.S.C. 40101 et seq.) (Shipping Act), the ICC Termination Act of 1995 (Public Law 104-88 109 Stat. 803), the Telecommunications Act of 1996, the Fairness to Contact Lens Consumers Act (Public Law 108-164 117 Stat. 2024, 1 5 U.S.C. 7601 et seq.), and the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203 124 Stat. 1376) (Dodd-Frank Act).(d) These statutes independently charge a number of executive departments and agencies (agencies) to protect conditions of fair competition in one or more ways, including by: (i) policing unfair, deceptive, and abusive business practices;(ii) resisting consolidation and promoting



*competition within industries through the independent oversight of mergers, acquisitions, and joint ventures; (iii) promulgating rules that promote competition, including the market entry of new competitors; and(iv) promoting market transparency through compelled disclosure of information.(e) The agencies that administer such or similar authorities include the Department of the Treasury, the Department of Agriculture, the Department of Health and Human Services, the Department of Transportation, the Federal Reserve System, the Federal Trade Commission (FTC), the Securities and Exchange Commission, the Federal Deposit Insurance Corporation, the Federal Communications Commission, the Federal Maritime Commission, the Commodity Futures Trading Commission, the Federal Energy Regulatory Commission, the Consumer Financial Protection Bureau, and the Surface Transportation Board.(f) Agencies can influence the conditions of competition through their exercise of regulatory authority or through the procurement process. See 41 U.S.C. 1705.(g) This order recognizes that a whole-of-government approach is necessary to address overconcentration, monopolization, and unfair competition in the American economy. Such an approach is supported by existing statutory mandates. Agencies can and should further the polices set forth in section 1 of this order by, among other things, adopting pro-competitive regulations and approaches to procurement and spending, and by rescinding regulations that create unnecessary barriers to entry that stifle competition.SEC. 3. Agency Cooperation in Oversight, Investigation, and Remedies. (a) The Congress frequently has created overlapping agency jurisdiction in the policing of anticompetitive conduct and the oversight of mergers. It is the policy of my Administration that, when agencies have overlapping jurisdiction, they should endeavor to cooperate fully in the exercise of their oversight authority, to benefit from the respective expertise of the agencies and to improve Government efficiency.(b) Where there is overlapping jurisdiction over particular cases, conduct, transactions, or industries, agencies are encouraged to coordinate their efforts, as appropriate and consistent with applicable law, with respect to:(i) the investigation of conduct potentially harmful to competition;(ii) the oversight of proposed mergers, acquisitions, and joint ventures; and(iii) the design, execution, and oversight of remedies.(c) The means of cooperation in cases of overlapping jurisdiction should include, as appropriate and consistent with applicable law:(i) sharing relevant information and industry data;(ii) in the case of major transactions, soliciting and giving significant consideration to the views of the Attorney General or the Chair of the FTC, as applicable; and(iii) cooperating with any concurrent Department of Justice or FTC oversight activities under the Sherman Act or Clayton Act.(d) Nothing in subsections (a) through (c) of this section shall be construed to suggest that the statutory standard applied by an agency, or its independent assessment under that standard, should be displaced or substituted by the judgment of the Attorney General or the Chair of the FTC. When their views are solicited, the Attorney General and the Chair of the FTC are encouraged to provide a response to the agency in time for the agency to consider it in advance of any statutory deadline for agency action. SEC. 4. The White House Competition Council. (a) There is established a White House Competition Council (Council) within the Executive Office of the President.(b) The Council shall coordinate, promote, and advance Federal Government efforts to address overconcentration, monopolization, and unfair competition in or directly affecting the American economy, including efforts to:(i) implement the administrative actions identified in this order;(ii) develop procedures and best practices for agency cooperation and coordination on matters of overlapping jurisdiction, as described in section 3 of this order;(iii) identify and advance any additional administrative actions necessary to further the policies set forth in section 1 of this order; and(iv) identify any potential legislative changes necessary to further the policies set forth in section 1 of this order.(c) The Council shall work across agencies to provide a coordinated response to overconcentration, monopolization, and unfair competition in or directly affecting the American economy. The Council shall also work with each agency to ensure that agency operations are conducted in a manner that promotes fair competition, as appropriate and consistent with applicable law.(d) The Council shall not discuss any current or anticipated enforcement actions.(e) The Council shall be led by the Assistant to the President for Economic Policy and Director of the National Economic Council, who shall serve as Chair of the*



# SPA30

Section 1 ...    15 U.S.C. § 1

Council. (f) In addition to the Chair, the Council shall consist of the following members:(i) the Secretary of the Treasury;(ii) the Secretary of Defense; (iii) the Attorney General;(iv) the Secretary of Agriculture;(v) the Secretary of Commerce; (vi) the Secretary of Labor;(vii) the Secretary of Health and Human Services;(viii) the Secretary of Transportation;(ix) the *Administrator* of the Office of Information and Regulatory Affairs; and(x) the heads of such other agencies and offices as the Chair may from time to time invite to participate.(g) The Chair shall invite the participation of the Chair of the FTC, the Chair of the Federal Communications Commission, the Chair of the Federal Maritime Commission, the Director of the Consumer Financial Protection Bureau, and the Chair of the Surface Transportation Board, to the extent consistent with their respective statutory authorities and obligations.(h) Members of the Council shall designate, not later than 30 days after the date of this order [July 9, 2021], a senior official within their respective agency or office who shall coordinate with the Council and who shall be responsible for overseeing the agency's or office's efforts to address overconcentration, monopolization, and unfair competition. The Chair may coordinate subgroups consisting exclusively of Council members or their designees, as appropriate.(i) The Council shall meet on a semi-annual basis unless the Chair determines that a meeting is unnecessary.(j) Each agency shall bear its own expenses for participating in the Council.SEC. 5. Further Agency Responsibilities. (a) The heads of all agencies shall consider using their authorities to further the policies set forth in section 1 of this order, with particular attention to:(i) the influence of any of their respective regulations, particularly any licensing regulations, on concentration and competition in the industries under their jurisdiction; and(ii) the potential for their procurement or other spending to improve the competitiveness of small businesses and businesses with fair labor practices.(b) The Attorney General, the Chair of the FTC, and the heads of other agencies with authority to enforce the Clayton Act are encouraged to enforce the antitrust laws fairly and vigorously.(c) To address the consolidation of industry in many markets across the economy, as described in section 1 of this order, the Attorney General and the Chair of the FTC are encouraged to review the horizontal and vertical merger guidelines and consider whether to revise those guidelines.(d) To avoid the potential for anticompetitive extension of market power beyond the scope of granted patents, and to protect standard-setting processes from abuse, the Attorney General and the Secretary of Commerce are encouraged to consider whether to revise their position on the intersection of the intellectual property and antitrust laws, including by considering whether to revise the Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments issued jointly by the Department of Justice, the United States Patent and Trademark Office, and the National Institute of Standards and Technology on December 19, 2019.(e) To ensure Americans have choices among financial institutions and to guard against excessive market power, the Attorney General, in consultation with the Chairman of the Board of Governors of the Federal Reserve System, the Chairperson of the Board of Directors of the Federal Deposit Insurance Corporation, and the Comptroller of the Currency, is encouraged to review current practices and adopt a plan, not later than 180 days after the date of this order, for the revitalization of merger oversight under the Bank Merger Act and the Bank Holding Company Act of 1956 (Public Law 84-511 70 Stat. 133, 12 U.S.C. 1841 et seq.) that is in accordance with the factors enumerated in 12 U.S.C. 1828(c) and 1842(c). (f) To better protect workers from wage collusion, the Attorney General and the Chair of the FTC are encouraged to consider whether to revise the Antitrust Guidance for Human Resource Professionals of October 2016.(g) To address agreements that may unduly limit workers' ability to change jobs, the Chair of the FTC is encouraged to consider working with the rest of the Commission to exercise the FTC's statutory rulemaking authority under the Federal Trade Commission Act to curtail the unfair use of non-compete clauses and other clauses or agreements that may unfairly limit worker mobility.(h) To address persistent and recurrent practices that inhibit competition, the Chair of the FTC, in the Chair's discretion, is also encouraged to consider working with the rest of the Commission to exercise the FTC's statutory rulemaking authority, as appropriate and consistent with applicable law, in areas such as:(i) unfair data collection and surveillance practices that may damage competition, consumer autonomy, and consumer privacy;(ii) unfair anticompetitive restrictions on third-



## SPA31

Section 1 ...     15 U.S.C. § 1

*party repair or self-repair of items, such as the restrictions imposed by powerful manufacturers that prevent farmers from repairing their own equipment;(iii) unfair anticompetitive conduct or agreements in the prescription drug industries, such as agreements to delay the market entry of generic drugs or biosimilars;(iv) unfair competition in major Internet marketplaces;(v) unfair occupational licensing restrictions;(vi) unfair tying practices or exclusionary practices in the brokerage or listing of real estate; and (vii) any other unfair industry-specific practices that substantially inhibit competition.(i) The Secretary of Agriculture shall:(i) to address the unfair treatment of farmers and improve conditions of competition in the markets for their products, consider initiating a rulemaking or rulemakings under the Packers and Stockyards Act to strengthen the Department of Agriculture's regulations concerning unfair, unjustly discriminatory, or deceptive practices and undue or unreasonable preferences, advantages, prejudices, or disadvantages, with the purpose of furthering the vigorous implementation of the law established by the Congress in 1921 and fortified by amendments. In such rulemaking or rulemakings, the Secretary of Agriculture shall consider, among other things: (A) providing clear rules that identify recurrent practices in the livestock, meat, and poultry industries that are unfair, unjustly discriminatory, or deceptive and therefore violate the Packers and Stockyards Act;(B) reinforcing the long-standing Department of Agriculture interpretation that it is unnecessary under the Packers and Stockyards Act to demonstrate industry-wide harm to establish a violation of the Act and that the "unfair, unjustly discriminatory, or deceptive" treatment of one farmer, the giving to one farmer of an "undue or unreasonable preference or advantage," or the subjection of one farmer to an "undue or unreasonable prejudice or disadvantage in any respect" violates the Act; (C) prohibiting unfair practices related to grower ranking systems-systems in which the poultry companies, contractors, or dealers exercise extraordinary control over numerous inputs that determine the amount farmers are paid and require farmers to assume the risk of factors outside their control, leaving them more economically vulnerable;(D) updating the appropriate definitions or set of criteria, or application thereof, for undue or unreasonable preferences, advantages, prejudices, or disadvantages under the Packers and Stockyards Act; and(E) adopting, to the greatest extent possible and as appropriate and consistent with applicable law, appropriate anti-retaliation protections, so that farmers may assert their rights without fear of retribution;(ii) to ensure consumers have accurate, transparent labels that enable them to choose products made in the United States, consider initiating a rulemaking to define the conditions under which the labeling of meat products can bear voluntary statements indicating that the product is of United States origin, such as "Product of USA";(iii) to ensure that farmers have greater opportunities to access markets and receive a fair return for their products, not later than 180 days after the date of this order, submit a report to the Chair of the White House Competition Council, with a plan to promote competition in the agricultural industries and to support value-added agriculture and alternative food distribution systems through such means as:(A) the creation or expansion of useful information for farmers, such as model contracts, to lower transaction costs and help farmers negotiate fair deals;(B) measures to encourage improvements in transparency and standards so that consumers may choose to purchase products that support fair treatment of farmers and agricultural workers and sustainable agricultural practices;(C) measures to enhance price discovery, increase transparency, and improve the functioning of the cattle and other livestock markets;(D) enhanced tools, including any new legislative authorities needed, to protect whistleblowers, monitor agricultural markets, and enforce relevant laws;(E) any investments or other support that could bolster competition within highly concentrated agricultural markets; and(F) any other means that the Secretary of Agriculture deems appropriate;(iv) to improve farmers' and smaller food processors' access to retail markets, not later than 300 days after the date of this order, in consultation with the Chair of the FTC, submit a report to the Chair of the White House Competition Council, on the effect of retail concentration and retailers' practices on the conditions of competition in the food industries, including any practices that may violate the Federal Trade Commission Act, the Robinson-Patman Act (Public Law 74-692 49 Stat. 1526, 1 5 U.S.C. 13 et seq.), or other relevant laws, and on grants, loans, and other support that may enhance access to retail markets*



# SPA32

*by local and regional food enterprises; and(v) to help ensure that the intellectual property system, while incentivizing innovation, does not also unnecessarily reduce competition in seed and other input markets beyond that reasonably contemplated by the Patent Act (see 3 5 U.S.C. 100 et seq. and 7 U.S.C. 2321 et seq.), in consultation with the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, submit a report to the Chair of the White House Competition Council, enumerating and describing any relevant concerns of the Department of Agriculture and strategies for addressing those concerns across intellectual property, antitrust, and other relevant laws. (j) To protect the vibrancy of the American markets for beer, wine, and spirits, and to improve market access for smaller, independent, and new operations, the Secretary of the Treasury, in consultation with the Attorney General and the Chair of the FTC, not later than 120 days after the date of this order, shall submit a report to the Chair of the White House Competition Council, assessing the current market structure and conditions of competition, including an assessment of any threats to competition and barriers to new entrants, including:(i) any unlawful trade practices in the beer, wine, and spirits markets, such as certain exclusionary, discriminatory, or anticompetitive distribution practices, that hinder smaller and independent businesses or new entrants from distributing their products; (ii) patterns of consolidation in production, distribution, or retail beer, wine, and spirits markets; and(iii) any unnecessary trade practice regulations of matters such as bottle sizes, permitting, or labeling that may unnecessarily inhibit competition by increasing costs without serving any public health, informational, or tax purpose.(k) To follow up on the foregoing assessment, the Secretary of the Treasury, through the Administrator of the Alcohol and Tobacco Tax and Trade Bureau, shall, not later than 240 days after the date of this order, consider:(i) initiating a rulemaking to update the Alcohol and Tobacco Tax and Trade Bureau's trade practice regulations; (ii) rescinding or revising any regulations of the beer, wine, and spirits industries that may unnecessarily inhibit competition; and (iii) reducing any barriers that impede market access for smaller and independent brewers, winemakers, and distilleries.(l) To promote competition, lower prices, and a vibrant and innovative telecommunications ecosystem, the Chair of the Federal Communications Commission is encouraged to work with the rest of the Commission, as appropriate and consistent with applicable law, to consider: (i) adopting through appropriate rulemaking "Net Neutrality" rules similar to those previously adopted under title II of the Communications Act of 1934 (Public Law 73-416 48 Stat. 1064, 4 7 U.S.C. 151 et seq.), as amended by the Telecommunications Act of 1996, in "Protecting and Promoting the Open internet," 80 Fed.Reg. 19738 (Apr. 13, 2015);(ii) conducting future spectrum auctions under rules that are designed to help avoid excessive concentration of spectrum license holdings in the United States, so as to prevent spectrum stockpiling, warehousing of spectrum by licensees, or the creation of barriers to entry, and to improve the conditions of competition in industries that depend upon radio spectrum, including mobile communications and radio-based broadband services;(iii) providing support for the continued development and adoption of 5G Open Radio Access Network (O-RAN) protocols and software, continuing to attend meetings of voluntary and consensus-based standards development organizations, so as to promote or encourage a fair and representative standard-setting process, and undertaking any other measures that might promote increased openness, innovation, and competition in the markets for 5G equipment;(iv) prohibiting unjust or unreasonable early termination fees for end-user communications contracts, enabling consumers to more easily switch providers; (v) initiating a rulemaking that requires broadband service providers to display a broadband consumer label, such as that as described in the Public Notice of the Commission issued on April 4, 2016 (DA 16-357), so as to give consumers clear, concise, and accurate information regarding provider prices and fees, performance, and network practices;(vi) initiating a rulemaking to require broadband service providers to regularly report broadband price and subscription rates to the Federal Communications Commission for the purpose of disseminating that information to the public in a useful manner, to improve price transparency and market functioning; and (vii) initiating a rulemaking to prevent landlords and cable and Internet service providers from inhibiting tenants' choices among providers.(m) The Secretary of Transportation shall:(i) to better*



protect consumers and improve competition, and as appropriate and consistent with applicable law: (A) not later than 30 days after the date of this order, appoint or reappoint members of the Advisory Committee for Aviation Consumer Protection to ensure fair representation of consumers, State and local interests, airlines, and airports with respect to the evaluation of aviation consumer protection programs and convene a meeting of the Committee as soon as practicable;(B) promote enhanced transparency and consumer safeguards, as appropriate and consistent with applicable law, including through potential rulemaking, enforcement actions, or guidance documents, with the aims of:(1) enhancing consumer access to airline flight information so that consumers can more easily find a broader set of available flights, including by new or lesser known airlines; and(2) ensuring that consumers are not exposed or subject to advertising, marketing, pricing, and charging of ancillary fees that may constitute an unfair or deceptive practice or an unfair method of competition;(C) not later than 45 days after the date of this order, submit a report to the Chair of the White House Competition Council, on the progress of the Department of Transportation's investigatory and enforcement activities to address the failure of airlines to provide timely refunds for flights cancelled as a result of the COVID-19 pandemic;(D) not later than 45 days after the date of this order, publish for notice and comment a proposed rule requiring airlines to refund baggage fees when a passenger's luggage is substantially delayed and other ancillary fees when passengers pay for a service that is not provided;(E) not later than 60 days after the date of this order, start development of proposed amendments to the Department of Transportation's definitions of "unfair" and "deceptive" in 49 U.S.C. 41712; and(F) not later than 90 days after the date of this order, consider initiating a rulemaking to ensure that consumers have ancillary fee information, including "baggage fees," "change fees," and "cancellation fees," at the time of ticket purchase;(ii) to provide consumers with more flight options at better prices and with improved service, and to extend opportunities for competition and market entry as the industry evolves:(A) not later than 30 days after the date of this order, convene a working group within the Department of Transportation to evaluate the effectiveness of existing commercial aviation programs, consumer protections, and rules of the Federal Aviation Administration;(B) consult with the Attorney General regarding means of enhancing effective coordination between the Department of Justice and the Department of Transportation to ensure competition in air transportation and the ability of new entrants to gain access; and (C) consider measures to support airport development and increased capacity and improve airport congestion management, gate access, implementation of airport competition plans pursuant to 49 U.S.C. 47106(f), and "slot" administration;(iii) given the emergence of new aerospace-based transportation technologies, such as low-altitude unmanned aircraft system deliveries, advanced air mobility, and high-altitude long endurance operations, that have great potential for American travelers and consumers, yet also the danger of early monopolization or new air traffic control problems, ensure that the Department of Transportation takes action with respect to these technologies to:(A) facilitate innovation that fosters United States market leadership and market entry to promote competition and economic opportunity and to resist monopolization, while also ensuring safety, providing security and privacy, protecting the environment, and promoting equity; and(B) provide vigilant oversight over market participants.(n) To further competition in the rail industry and to provide accessible remedies for shippers, the Chair of the Surface Transportation Board (Chair) is encouraged to work with the rest of the Board to:(i) consider commencing or continuing a rulemaking to strengthen regulations pertaining to reciprocal switching agreements pursuant to 49 U.S.C. 11102(c), if the Chair determines such rulemaking to be in the public interest or necessary to provide competitive rail service;(ii) consider rulemakings pertaining to any other relevant matter of competitive access, including bottleneck rates, interchange commitments, or other matters, consistent with the policies set forth in section 1 of this order;(iii) to ensure that passenger rail service is not subject to unwarranted delays and interruptions in service due to host railroads' failure to comply with the required preference for passenger rail, vigorously enforce new on-time performance requirements adopted pursuant to the Passenger Rail Investment and Improvement Act of 2008 (Public Law 110-423 122 Stat. 4907) that will take effect on July 1, 2021, and



# SPA34

Section 1 ...    15 U.S.C. § 1

*further the work of the passenger rail working group formed to ensure that the Surface Transportation Board will fully meet its obligations; and(iv) in the process of determining whether a merger, acquisition, or other transaction involving rail carriers is consistent with the public interest under 49 U.S.C. 11323-25, consider a carrier's fulfillment of its responsibilities under 49 U.S.C. 24308 (relating to Amtrak's statutory rights).(o) The Chair of the Federal Maritime Commission is encouraged to work with the rest of the Commission to:(i) vigorously enforce the prohibition of unjust and unreasonable practices in the context of detention and demurrage pursuant to the Shipping Act, as clarified in "Interpretive Rule on Demurrage and Detention Under the Shipping Act," 85 Fef. [sic] Reg. 29638 (May 18, 2020); (ii) request from the National Shipper Advisory Committee recommendations for improving detention and demurrage practices and enforcement of related Shipping Act prohibitions; and(iii) consider further rulemaking to improve detention and demurrage practices and enforcement of related Shipping Act prohibitions.(p) The Secretary of Health and Human Services shall:(i) to promote the wide availability of low-cost hearing aids, not later than 120 days after the date of this order, publish for notice and comment a proposed rule on over-the-counter hearing-aids, as called for by section 709 of the FDA Reauthorization Act of 2017 (Public Law 115-52 131 Stat. 1005); (ii) support existing price transparency initiatives for hospitals, other providers, and insurers along with any new price transparency initiatives or changes made necessary by the No Surprises Act (Public Law 116-260 134 Stat. 2758) or any other statutes;(iii) to ensure that Americans can choose health insurance plans that meet their needs and compare plan offerings, implement standardized options in the national Health Insurance Marketplace and any other appropriate mechanisms to improve competition and consumer choice; (iv) not later than 45 days after the date of this order, submit a report to the Assistant to the President for Domestic Policy and Director of the Domestic Policy Council and to the Chair of the White House Competition Council, with a plan to continue the effort to combat excessive pricing of prescription drugs and enhance domestic pharmaceutical supply chains, to reduce the prices paid by the Federal Government for such drugs, and to address the recurrent problem of price gouging; (v) to lower the prices of and improve access to prescription drugs and biologics, continue to promote generic drug and biosimilar competition, as contemplated by the Drug Competition Action Plan of 2017 and Biosimilar Action Plan of 2018 of the Food and Drug Administration (FDA), including by: (A) continuing to clarify and improve the approval framework for generic drugs and biosimilars to make generic drug and biosimilar approval more transparent, efficient, and predictable, including improving and clarifying the standards for interchangeability of biological products;(B) as authorized by the Advancing Education on Biosimilars Act of 2021 (Public Law 117-8 135 Stat. 254, 42 U.S.C. 263-1), supporting biosimilar product adoption by providing effective educational materials and communications to improve understanding of biosimilar and interchangeable products among healthcare providers, patients, and caregivers;(C) to facilitate the development and approval of biosimilar and interchangeable products, continuing to update the FDA's biologics regulations to clarify existing requirements and procedures related to the review and submission of Biologics License Applications by advancing the "Biologics Regulation Modernization" rulemaking (RIN 0910-AI14); and(D) with the Chair of the FTC, identifying and addressing any efforts to impede generic drug and biosimilar competition, including but not limited to false, misleading, or otherwise deceptive statements about generic drug and biosimilar products and their safety or effectiveness;(vi) to help ensure that the patent system, while incentivizing innovation, does not also unjustifiably delay generic drug and biosimilar competition beyond that reasonably contemplated by applicable law, not later than 45 days after the date of this order, through the Commissioner of Food and Drugs, write a letter to the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office enumerating and describing any relevant concerns of the FDA;(vii) to support the market entry of lower-cost generic drugs and biosimilars, continue the implementation of the law widely known as the CREATES Act of 2019 (Public Law 116-94 133 Stat. 3130), by: (A) promptly issuing Covered Product Authorizations (CPAs) to assist product developers with obtaining brand-drug samples; and(B) issuing guidance*



# SPA35

Section 1 ...    15 U.S.C. § 1

to provide additional information for industry about CPAs; and(viii) through the *Administrator* of the Centers for Medicare and Medicaid Services, prepare for Medicare and Medicaid coverage of interchangeable biological products, and for payment models to support increased utilization of generic drugs and biosimilars.(q) To reduce the cost of covered products to the American consumer without imposing additional risk to public health and safety, the Commissioner of Food and Drugs shall work with States and Indian Tribes that propose to develop section 804 Importation Programs in accordance with the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Public Law 108-173 117 Stat. 2066), and the FDA's implementing regulations.(r) The Secretary of Commerce shall:(i) acting through the Director of the National Institute of Standards and Technology (NIST), consider initiating a rulemaking to require agencies to report to NIST, on an annual basis, their contractors' utilization activities, as reported to the agencies under 3 5 U.S.C. 202(c)(5) ;(ii) acting through the Director of NIST, consistent with the policies set forth in section 1 of this order, consider not finalizing any provisions on march-in rights and product pricing in the proposed rule "Rights to Federally Funded Inventions and Licensing of Government Owned Inventions," 86 Fed. Reg. 35 (Jan. 4, 2021); and (iii) not later than 1 year after the date of this order, in consultation with the Attorney General and the Chair of the Federal Trade Commission, conduct a study, including by conducting an open and transparent stakeholder consultation process, of the mobile application ecosystem, and submit a report to the Chair of the White House Competition Council, regarding findings and recommendations for improving competition, reducing barriers to entry, and maximizing user benefit with respect to the ecosystem. (s) The Secretary of Defense shall:(i) ensure that the Department of Defense's assessment of the economic forces and structures shaping the capacity of the national security innovation base pursuant to section 889(a) and (b) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116-283 134 Stat. 3388) is consistent with the policy set forth in section 1 of this order; (ii) not later than 180 days after the date of this order, submit to the Chair of the White House Competition Council, a review of the state of competition within the defense industrial base, including areas where a lack of competition may be of concern and any recommendations for improving the solicitation process, consistent with the goal of the Competition in Contracting Act of 1984 (Public Law 98-369 98 Stat. 1175); and (iii) not later than 180 days after the date of this order, submit a report to the Chair of the White House Competition Council, on a plan for avoiding contract terms in procurement agreements that make it challenging or impossible for the Department of Defense or service members to repair their own equipment, particularly in the field.(t) The Director of the Consumer Financial Protection Bureau, consistent with the pro-competition objectives stated in section 1021 of the Dodd-Frank Act [12 U.S.C. 5511], is encouraged to consider: (i) commencing or continuing a rulemaking under section 1033 of the Dodd-Frank Act [12 U.S.C. 5533] to facilitate the portability of consumer financial transaction data so consumers can more easily switch financial institutions and use new, innovative financial products; and(ii) enforcing the prohibition on unfair, deceptive, or abusive acts or practices in consumer financial products or services pursuant to section 1031 of the Dodd-Frank Act [12 U.S.C. 5531] so as to ensure that actors engaged in unlawful activities do not distort the proper functioning of the competitive process or obtain an unfair advantage over competitors who follow the law.(u) The Director of the Office of Management and Budget, through the *Administrator* of the Office of Information and Regulatory Affairs, shall incorporate into its recommendations for modernizing and improving regulatory review required by my Memorandum of January 20, 2021 (Modernizing Regulatory Review) [86 F.R. 7223], the policies set forth in section 1 of this order, including consideration of whether the effects on competition and the potential for creation of barriers to entry should be included in regulatory impact analyses.(v) The Secretary of the Treasury shall:(i) direct the Office of Economic Policy, in consultation with the Attorney General, the Secretary of Labor, and the Chair of the FTC, to submit a report to the Chair of the White House Competition Council, not later than 180 days after the date of this order, on the effects of lack of competition on labor markets; and (ii) submit a report to the Chair of the White House Competition Council, not later than 270 days after the date of



# SPA36

*this order, assessing the effects on competition of large technology firms' and other non-bank companies' entry into consumer finance markets.SEC. 6. General Provisions. (a) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.(b) Where not already specified, independent agencies are encouraged to comply with the requirements of this order.(c) Nothing in this order shall be construed to impair or otherwise affect:(i) the authority granted by law to an executive department or agency, or the head thereof; or(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.(d) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. J.R. Biden, Jr.*



# SPA37

# 15 U.S.C. § 2

Section 2 - Monopolizing trade a felony; penalty

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

*15 U.S.C. § 2*

July 2, 1890, ch. 647, §2, 26 Stat. 209; July 7, 1955, ch. 281, 69 Stat. 282; Pub. L. 93-528, §3, Dec. 21, 1974, 88 Stat. 1708; Pub. L. 101-588, §4(b), Nov. 16, 1990, 104 Stat. 2880; Pub. L. 108-237, title II, §215(b), June 22, 2004, 118 Stat. 668.

**EDITORIAL NOTES**

**AMENDMENTS2004-** *Pub. L. 108-237 substituted "$100,000,000" for "$10,000,000", "$1,000,000" for "$350,000", and "10" for "three".* **1990-** *Pub. L. 101-588 substituted "$10,000,000" for "one million dollars" and "$350,000" for "one hundred thousand dollars".* **1974-** *Pub. L. 93-528 substituted "a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years" for "a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year".* **1955-** *Act July 7, 1955, substituted "fifty thousand dollars" for "five thousand dollars".*


casetext
Part of Thomson Reuters

attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

(2) *Motion for Sanctions.* A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

(3) *On the Court's Initiative.* On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

(4) *Nature of a Sanction.* A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

(5) *Limitations on Monetary Sanctions.* The court must not impose a monetary sanction:

    (A) against a represented party for violating Rule 11(b)(2); or

    (B) on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

(6) *Requirements for an Order.* An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

(d) INAPPLICABILITY TO DISCOVERY. This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.

(As amended Apr. 28, 1983, eff. Aug. 1, 1983; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007.)

**Rule 12. Defenses and Objections: When and How Presented; Motion for Judgment on the Pleadings; Consolidating Motions; Waiving Defenses; Pretrial Hearing**

(a) TIME TO SERVE A RESPONSIVE PLEADING.

(1) *In General.* Unless another time is specified by this rule or a federal statute, the time for serving a responsive pleading is as follows:

    (A) A defendant must serve an answer:

        (i) within 21 days after being served with the summons and complaint; or

        (ii) if it has timely waived service under Rule 4(d), within 60 days after the request for a waiver was sent,

17          FEDERAL RULES OF CIVIL PROCEDURE         **Rule 12**

or within 90 days after it was sent to the defendant outside any judicial district of the United States.

(B) A party must serve an answer to a counterclaim or crossclaim within 21 days after being served with the pleading that states the counterclaim or crossclaim.

(C) A party must serve a reply to an answer within 21 days after being served with an order to reply, unless the order specifies a different time.

(2) *United States and Its Agencies, Officers, or Employees Sued in an Official Capacity.* The United States, a United States agency, or a United States officer or employee sued only in an official capacity must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the United States attorney.

(3) *United States Officers or Employees Sued in an Individual Capacity.* A United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the officer or employee or service on the United States attorney, whichever is later.

(4) *Effect of a Motion.* Unless the court sets a different time, serving a motion under this rule alters these periods as follows:

(A) if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action; or

(B) if the court grants a motion for a more definite statement, the responsive pleading must be served within 14 days after the more definite statement is served.

(b) HOW TO PRESENT DEFENSES. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

(c) MOTION FOR JUDGMENT ON THE PLEADINGS. After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.

(d) RESULT OF PRESENTING MATTERS OUTSIDE THE PLEADINGS. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All

**Rule 12**  FEDERAL RULES OF CIVIL PROCEDURE  18

parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

(e) MOTION FOR A MORE DEFINITE STATEMENT. A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

(f) MOTION TO STRIKE. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

(1) on its own; or

(2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

(g) JOINING MOTIONS.

(1) *Right to Join.* A motion under this rule may be joined with any other motion allowed by this rule.

(2) *Limitation on Further Motions.* Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

(h) WAIVING AND PRESERVING CERTAIN DEFENSES.

(1) *When Some Are Waived.* A party waives any defense listed in Rule 12(b)(2)–(5) by:

(A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or

(B) failing to either:

(i) make it by motion under this rule; or

(ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.

(2) *When to Raise Others.* Failure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim may be raised:

(A) in any pleading allowed or ordered under Rule 7(a);

(B) by a motion under Rule 12(c); or

(C) at trial.

(3) *Lack of Subject-Matter Jurisdiction.* If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

(i) HEARING BEFORE TRIAL. If a party so moves, any defense listed in Rule 12(b)(1)–(7)—whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)